GRAND TRUNK WESTERN RAILROAD COMPANY *v.* CITY
OF DETROIT.

1. MUNICIPAL CORPORATIONS—ZONING ORDINANCE—RAILROADS—RES-
IDENCES.

Zoning ordinance which restricted use of property adjoining rail-
road track to sites for 2½-story multiple dwellings constituted
an interference with use of such property by owners desiring;
to use their property for purposes not in conformity with such
ordinance.

2. CONSTITUTIONAL LAW—ORDINANCES—COURTS.

Generally courts will not inquire into the motives of legislation
when the legislative body possesses the power to do the act and;
exercises it as prescribed by the organic law and neither the
motives of the members nor the inferences under which they
act can be shown to nullify an ordinance duly passed within
the scope of the corporation powers.

3. MUNICIPAL CORPORATIONS—ZONING—DEPRESSION OF VALUE—EM-
INENT DOMAIN.

Use of zoning power as a means of depressing the value of prop-
erty which the municipality contemplates taking under the pow-
er of eminent domain is such a maladministration of the power
to zone property as to require the deprivation of the use of such
power with respect to property so affected.

4. SAME—ZONING ORDINANCES.

The zoning ordinance of a city or village must give reasonable
consideration to the character of the district, its peculiar suit-
ability for particular uses, the conservation of property values

REFERENCES FOR POINTS IN HEADNOTES

[1, 9] 58 Am Jur, Zoning, §§ 19, 34, 38.
[2] 14 Am Jur, Courts, § 202.
[4, 9] 58 Am Jur, Zoning, § 142.
[6, 9] 58 Am Jur, Zoning, § 141.
[7, 9] 58 Am Jur, Zoning, § 21.
[8, 9] 58 Am Jur, Zoning, §§ 139, 140.

and the general trend and character of building and population development (CL 1948, § 125.581).

5. SAME—ZONING ORDINANCES—STATUTES.

The statute enabling cities and villages to enact zoning ordinances does not give a blanket indorsement to every instance of zoning but outlines the tests to be applied to the ordinance (CL 1948, § 125.581).

6. SAME—ZONING ORDINANCE—VALUE—BEAUTY.

A municipal zoning ordinance is unreasonable which restricts property to a use for which the property is not adapted and thereby destroys the greater part of its value in order that the beauty of the municipality as a whole may be enhanced, since such a restriction itself constitutes an invasion of property rights.

7. SAME—POLICE POWER—ZONING ORDINANCE.

Legislators may not, under the guise of police power, impose restrictions by way of a zoning ordinance, that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities.

8. SAME—ZONING ORDINANCE—VALUE.

A zoning ordinance which renders property almost worthless is unreasonable and confiscatory and therefore illegal.

9. SAME—ZONING ORDINANCE—INDUSTRIAL USES—RESIDENCE.

Zoning ordinance which restricted use of property, 1 block by 13 blocks long, abutting or adjacent to railroad right of way on which tracks were depressed, to use for multiple dwellings $2\frac{1}{2}$ stories in height *held,* unreasonable and confiscatory, since property was not suitable for use to which restricted, and testimony showed it was worth from 3 to 10 times more for industrial uses than residential purposes.

Appeal from Wayne; Murphy (Thomas J.), J. Submitted October 13, 1949. (Docket No. 46, Calendar No. 44,537.) Decided December 8, 1949.

Bill by Grand Trunk Western Railroad Company and others against City of Detroit to restrain en-

forcement of rezoning ordinance. Decree for defendant. Plaintiffs appeal. Reversed.

*H. V. Spike* and *William W. MacPherson,* for plaintiff Grand Trunk Western Railroad Company.

*Friedman, Meyers & Keys,* for plaintiff Shapiro.

*Warner, Norcross & Judd,* for plaintiff Inter-State Motor Freight System and Acme Truck Rentals, Inc.

*Richard S. Weber,* for plaintiffs Weber.

*Raymond J. Kelly,* Corporation Counsel, and *John G. Dunn* and *Arthur L. Barkey,* Assistants Corporation Counsel, for defendant.

BUTZEL, J. Plaintiffs Grand Trunk Western Railroad Company, *et al.,* filed a bill to restrain the enforcement of a rezoning ordinance of the defendant city of Detroit. They alleged that the ordinance is unreasonable and illegal and ask that it be declared null and void so far as it affects their property. After a hearing, the trial court dismissed the bill and plaintiffs appeal. We shall detail the ordinance, a description of the property involved, its character, and as many of the facts set forth in the lengthy record as we deem necessary to resolve the determining issues of the case.

Plaintiffs attack the validity of the rezoning ordinance of the city of Detroit adopted July 16, 1941, as applied to their respective parcels of property, the use of which the ordinance restricts to multiple dwellings $2\frac{1}{2}$ stories in height. This ordinance was adopted almost on the heels of a former one which became effective the previous December and zoned the use of a large part of the same properties for heavy manufacturing purposes and a small part for light manufacturing. The record shows no change in

the character of the property during this short interval of time nor for many years prior thereto.

The area in question is located approximately one mile east of the central downtown section of the city. It is 13 blocks in length and 1 block (the equivalent of 2 short city blocks) in width in a very old section of the city. It is bounded on the north by Gratiot avenue and a near-by cross street and on the south by Jefferson avenue, on the east by St. Aubin avenue and on the west by Orleans street. The area is bisected by the right of way of the main line of the railroad, running north and south, of plaintiff Grand Trunk Western Railroad Company, referred to herein as Grand Trunk. This right of way consists of 4 tracks, 2 of which are used for regular trains and the other 2 for switching purposes. Grand Trunk has depressed these tracks and, except in a few places, owns long strips of land abutting each side of the right of way. A map introduced as an exhibit indicates that coplaintiff Inter-State Motor Freight System owns or has acquired an interest in Grand Trunk's strips adjoining the east side of the right of way between 2 cross streets, and that coplaintiff Shapiro owns or has acquired an interest in similar lands further north on the same side of the right of way. The properties of the other plaintiffs adjoin the vacant lands of the Grand Trunk that abut its tracks. Altogether, plaintiffs' property covers many hundred thousands of square feet, about 90 per cent. of which is unimproved.

The rezoned area itself contains freight terminals, junk yards, factories, gasoline stations, a coal yard, a mattress factory, a steel treating company with furnaces in operation, tool and die companies, a cleaning and dyeing plant, 2 foundries, a pattern shop, et cetera. It also contains 528 residences, which are at least 40 to 50 years old. From the photo-

graphs in the file it would appear that many of them are much older and in a sad state of disrepair.

Very large packing and other wholesale food purveyors have their places of business and warehouses in the vicinity north of the area rezoned by the ordinance. The Detroit Eastern market, a very large wholesale and retail food center, is but a few blocks distant. Immediately south of Jefferson avenue, the southern line of the area, are numerous large buildings abutting the railroad's right of way and used for nonresidential purposes.

The legality of the ordinance as applied to these lands is assailed for several reasons. In adopting the ordinance, was reasonable consideration given to the character of the district, its peculiar suitability for particular uses, the conservation of property values, and the general trend and character of building and population development, as is required by the zoning law? Did it result, in effect, in a confiscation of property, was it unreasonable and arbitrary in nature and therefore illegal?

The claim is made that the new zoning ordinance does not affect the present uses to which the property is put and that, therefore, there is no cause for complaint. This is fallacious reasoning. The plaintiffs do claim the right to build on their presently vacant and unproductive property, but are prevented from doing so except in conformity with the provisions of an ordinance that they contend illegally, arbitrarily and unreasonably deprives them of their rights.

The record shows that shortly after the railroad tracks were lowered the financial depression of the thirties set in; that this was followed by the war period during which both labor and materials were unavailable except for armament; that large parcels of property in outlying districts of the city having railroad frontage were first developed, few of the

latter now being available; that at the present time there is a scarcity of property with railroad siding facilities near the center of the city and such of these as are available have great value.

Testimony shows that Grand Trunk has recently received a number of inquiries in regard to its property but owing to the present zoning ordinance it has been unable to enter into any transactions. It was further shown that Grand Trunk could level off its slanting strips of land beside its right of way and such leveled land could be used to good advantage for sidings by buildings erected on adjacent lands with their lower floors on a level with the railroad tracks. This would result in the economical, rapid and easy handling of merchandise and freight in these structures and also use Grand Trunk's lands for railroad purposes.

Plaintiffs introduced testimony to show that their land was 7 to 10 times more valuable for industrial than for residential uses. Defendant's witnesses conceded that the land was 3 times more valuable if not restricted to residential purposes.

There is a preponderance of evidence that the property as rezoned is totally unfit for the sole purpose permitted by the ordinance and that no one with any business sense whatsoever would build such multiple dwellings 2½ stories in height in this area. Defendant claims that it is the most blighted area in the entire city. It was shown that there is a clanging of bells, dirt, noises and smoke from the passing trains and switching engines. No new residential buildings have been erected in the area for many long years. The evidence clearly shows that none are apt to be constructed unless the entire area is first condemned. Defendant concedes that the entire area must be condemned before the blight on it can be removed. The effect of the ordinance is to prevent the use of much of plaintiffs' property in the

zone in question for any profitable purpose. There is no foreseeable return to most of them from their vacant property if the *status quo* established by the ordinance is maintained.

Plaintiff Shapiro sought a permit to erect an abattoir on his premises which abut the railroad's right of way. He purchased his property from Wilson & Company and others. The property has a solid wall abutting railroad tracks, the right to use what formerly may have been sloping land adjacent thereto or the ownership thereof evidently having been acquired by him or his predecessors in title and leveled off. A railroad siding runs alongside his property. This plaintiff for the first time became aware of the adoption of the new ordinance when he was refused the permit. Father Schneider, the administrator of St. Joseph's Parish, whose buildings consist of a church and rectory, 2 schools, the Christian Brothers home, and a convent, all grouped together, had filed a protest to the issuance of the permit. St. Joseph's Commercial College and the home mentioned lie across the tracks and about 150 feet west of the Shapiro property. At a hearing of the instant case, Fr. Schneider, as witness for defendant, testified on cross-examination that he did not object to the use of the property for warehouses on the lower portion of the area but that he did object to noises from manufacturing concerns, which would disturb the school where approximately 500 boys were receiving their education. He stressed the need of playgrounds. His testimony clearly shows the unfitness of the area for multiple dwellings $2\frac{1}{2}$ stories in height, the only use permitted by the ordinance. He stated in part:

"A warehouse down here on the corner of Jefferson and the railroad, or Larned and the railroad would not interfere with our church. A warehouse or small industrial plant on Fort street or any place

in this area near Jefferson avenue would not detrimentally affect our church. In other words, what I am interested in opposing, is any use of the land immediately across the tracks from our church, which would interfere with the teaching of these boys that come to our school. The priests' house is right opposite the school, right alongside the railroad, except for a narrow parking lane. The priest who sleeps over there, Father Paul —— he is editor of the Michigan Catholic, sleeps on that side, and every once in a while he says he almost fell out of bed from the shock of the switching over there. I am on the other side and I don't notice it so much. In fact, I am a pretty sound sleeper, anyway. The ones that sleep on that side have some objection to that. It is the sound and the shock. It is very distinct when you are in church, even from the pulpit you can feel the whole church shake. There is quite a bit of smoke. You can try to let trees grow alongside to keep it away. The smoke is a big nuisance. It tends to keep the premises sooty and dirty, very much so. We just put in an oil-heating plant last fall, into the church, which would remove some of the dirt, but those engines make more than all the others, because it comes in such gushes. As a rule, they stop at about Antietam, and get up steam, and then they start pulling up the hill there. They start blowing cinders right out of the stack."

There was testimony on behalf of plaintiffs showing that the railroad is apt to be hazardous and dangerous to children living in the neighborhood; also, that solid blocks devoted to industry on each side of the railroad's property would prevent children from getting onto the railroad right of way; that the noise, smoke and gases rendered the neighborhood unfit for residential use. There was also testimony showing the heavy traffic on the streets through this section, but this is also true of some very fine residential districts in Detroit; further, that a general plan for condemnation of property near this area, so as to use

it for residential purposes, was contemplated or in progress. The court in its opinion held that the larger part of the land in question would never be used for commerce or industry and, such being the case, to zone it for commercial use would be to continue the blight. We are not in accord with this conclusion.

The underlying reason for the adoption of the ordinance was disclosed by Mr. George P. Emery, a director of the Detroit city planning commission, its secretary, and a man of the very highest qualifications. He was frank and fair in his testimony on behalf of the city. We quote from his testimony as follows:

"As a matter of fact, at the time we were instrumental in having the ordinance changed, we knew that private owners would not come in and build under these circumstances.  *  *  *  We did not expect private industry or private owners would come in and erect these multiple dwellings.  *  *  *  We thought it would be a private housing development on condemnation by the public. A combination, if you will, or private. We did not expect it to be used for public housing. And by that I mean, housing erected and operated by the public.

"*The Court:* But you did have some idea it might be necessary to condemn the property, use the power of eminent domain and condemn the property, in order to make it into the type of neighborhood you thought was desired.

"*A.* Yes, sir, and that might be done by private enterprise under the urban redevelopment law. The city could condemn it as an agent, in effect, for private enterprise.

"*The Court:* But you had to have condemnation?

"*A.* We knew there had to be some method of that kind to do it. Otherwise the prices would be exorbitant for individual parcels.

"*The Court:* And the blight would continue?

"*A.* And the blight would continue, yes, sir."

The court, in its opinion dismissing the bill, also stated that a charge that the rezoning was to depress values as a condition precedent to condemnation proceedings practically amounts to a charge of fraud and that such an accusation against public officers must be proven by very direct and positive testimony as, under the law, fraud is never to be lightly inferred. The common council relies largely upon the recommendations of the city planning commission. Mr. Emery did state that at the time of the adoption of the new zoning ordinance plans were not in the offing for a public housing project, but he further stated:

"I said that studies had been underway with respect to the blight problem of these close-in areas, in the downtown, boulevard section, and that it was realized that apparently the only way they could be reclaimed and built up for any purpose would be by—probably the public would have to participate and assist in some enterprise of that kind."

The city planning commission and the common council obviously attempted to stop further building in the area. However, they proceeded in an improper manner. They could have brought condemnation proceedings.

Our attention is directed to the rule that courts will not inquire into the motives of legislation when the legislative body possesses the power to do the act and exercises it as prescribed by the organic law; that neither the motives of the members nor the inferences under which they act can be shown to nullify an ordinance duly passed within the scope of the corporation powers. 2 McQuillin, Municipal Corporations (2d Rev Ed), § 739, p 821; *People* v. *Gardner,* 143 Mich 104; *People* v. *Gibbs,* 186 Mich 127 (Ann Cas 1917B 830). Also, see Smith on Zoning Laws and Practice, p 55. The rule has been followed

in numerous States. We are not imputing improper motives or inferences. The testimony of Mr. Emery speaks for itself. In *State, ex rel. Tingley,* v. *Gurda,* 209 Wis 63 (243 NW 317), under facts analogous to those in the instant case, the court in setting aside the zoning ordinance as to the property involved, said:

"In an effort to find the purpose of such a method of zoning, we find suggestions in the record that the city planning commission contemplates some time in the future a boulevard along Mud Creek, and with that in view, a zoning regulation has been promulgated destroying the value of the property which will later have to be taken for that purpose, so that the city may be able to carry out the boulevarding project with less expense to itself. While it may not be proper to thus interpret the motives and purposes actuating the city council in enacting the zoning ordinance, where such an unusual situation is found as appears here, such testimony may be given some weight. If such should be the purpose, it must reflect most seriously upon the good faith of the council, and furnishes an opportunity to give warning that such maladministration of power may result in deprivation thereof.

"The zoning power is one which may be used to the great benefit and advantage of a city, but as this case indicates, it is a power which may be greatly abused if it is to be used as a means to depress the values of property which the city may upon some future occasion desire to take under the power of eminent domain. Such a use of the power is utterly unreasonable, and cannot be sanctioned. It is entirely beyond the purpose of the zoning law to condemn a block in the heart of an industrial section to residential purposes only, for which purposes it is largely valueless because of the reason that it is in the heart of an industrial area."

Also, see *State, ex rel. Scandrett,* v. *Nelson,* 240 Wis 438 (3 NW2d 765).

The enabling act for the zoning of city or village districts specifically provides that:

"Such regulations  *  *  *  shall be made  *  *  * with reasonable consideration, among other things, to the character of the district, its peculiar suitability for particular uses, the conservation of property values and the general trend and character of building and population development." CL 1948, § 125.-581 (Stat Ann 1949 Rev § 5.2931).

As stated in *City of Pleasant Ridge* v. *Cooper,* 267 Mich 603, the statute does not give a blanket indorsement of every instance of zoning. It "outlines the tests to be applied to the ordinance." In that case we quoted with approval from *Dowsey* v. *Village of Kensington,* 257 NY 221 (177 NE 427, 86 ALR 642), to the effect that an ordinance was unreasonable which restricted property upon the boundary of the village to a use for which the property is not adapted and thereby destroyed the greater part of its value in order that the beauty of the village as a whole may be enhanced. Such a restriction itself constitutes an invasion of property rights. In *City of North Muskegon* v. *Miller,* 249 Mich 52, we followed the rule that legislators may not, under the guise of police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities. Also, see *Pringle* v. *Shevnock,* 309 Mich 179. In *Pere Marquette Railway Co.* v. *Muskegon Township Board,* 298 Mich 31, we were confronted with a situation somewhat similar to the one presented in the instant case. We held that the land was solely adapted to industrial use and was not suitable for residential use where children could enjoy good air and immunity from railroad hazards.

It was held in *Ervin Acceptance Co.* v. *City of Ann Arbor*, 322 Mich 404, a zoning ordinance which renders property almost worthless is unreasonable and confiscatory and therefore illegal.

Defendant contends that these cases are distinguishable from the instant one in that they refer to spot zoning. The same general principles of law are applicable, however, regardless of whether the area comprises 1 block or 13, where the ordinance as to each block is unreasonable.

We have heretofore discussed the reasons advanced by plaintiffs to show why the property has not been improved and also the possibilities of the property for industrial and commercial purposes. It is not the province of this Court to foretell what will happen in the future but it is apparent from the testimony in the case and the character of the property in the entire area, 95 per cent. of which is built on, that no prudent investor would build multiple dwellings $2\frac{1}{2}$ stories high either on the railroad's right of way or on the strips of land abutting it or on the adjoining lands, unless they were first condemned by the city. The trial judge referred to other condemnation proceedings now going on and also stated that the city expects to condemn a portion of this property involved, tear down the buildings, and erect or interest private investors in erecting modern multiple dwellings, and that seems to the court to offer the best solution of the problem. He further stated that the testimony shows that all of this property is to be eventually condemned and used for multiple dwellings, and this seemed the only way that this blighted area could be rehabilitated. The statement is plain and shows, as does the record, that the plaintiffs' property is of practically no value for multiple dwellings, that it must be condemned, together with the entire area, before it can be properly used for the purposes contemplated. To

follow the reasoning of the trial judge, therefore, 2 steps are to be taken: First, to render plaintiffs' properties, through the zoning ordinance, of little, if any, value, and then to condemn them. If the new zoning ordinance were set aside as unreasonable and confiscatory, as we hold it should be, any claims of defendant minimizing the value or lack thereof of the property for industrial purposes up to the time of the commencement of the condemnation proceedings could be shown in determining the amount of the award in a proper action. This zoning law is unreasonable and confiscatory and, therefore, illegal as far as it affects plaintiffs' properties and it is declared null and void to that extent.

The decree of the lower court is reversed, with costs of both courts to plaintiffs. A proper decree will be entered in this Court.

SHARPE, C. J., and BUSHNELL, BOYLES, REID, NORTH, DETHMERS, and CARR, JJ., concurred.