**MADISON REALTY COMPANY, a Michigan Corporation, Plaintiff,**

v.

**The CITY OF DETROIT, a Municipal Corporation of the State of Michigan, Defendant.**

**Civ. A. No. 25682.**

United States District Court,
E. D. Michigan, S. D.
July 9, 1970.

**368**

Gellert A. Seel, Detroit, Mich., for plaintiff.

Solomon Bienenfeld, Detroit, Mich., for Board of Governors of Wayne State University.

Robert Reese, Detroit, Mich., for City of Detroit.

KEITH, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Madison Realty Company, a Michigan Corporation, brings this action against the City of Detroit under Title 28 U.S.C. § 1331 and pursuant to the Constitution of the United States, Article XIV, § 1, claiming that the activities of defendant City in initiating certain condemnation proceedings as early as 1952 and in advancing said proceedings until the time of acquisition of plaintiff's property in 1965 resulted in a "taking" by Defendant City of plaintiff's property without due process of law.

As it relates to the history of plaintiff's property, it is either stipulated or undisputed by the parties:

That on July 15, 1947, plaintiff acquired a four-story apartment building then consisting of 47 units located at 5427–47 Fourth Street in the City of Detroit;

That, in 1951 and 1952 the number of rental units in the subject property was increased to 53 units;

That, sometime early in the 1950's Wayne State University inaugurated a vast expansion program and set about drafting and proposing various expansion plans;

That, beginning November 2, 1952 and thereafter various articles and diagrams appeared in published news media indicating the area to be acquired for said expansion program;

That, said publications made it readily apparent that plaintiff's property was included in the expansion area and was subject to acquisition;

That, on August 13, 1956, upon petition of Wayne State University, the Common Council for the City of Detroit passed a resolution authorizing and directing the Department of Buildings and Safety for the City to defer the issuance of any building permit for improvement in the Wayne State University Campus Extension area, and to notify the Secretary of the Board of Governors of Wayne State University of the filing of such application for improvement;

That, in 1957, plaintiff met with certain representatives of the Housing Commission for the City of Detroit who officially alerted plaintiff that they had been informed that Wayne State University would take the property in question within a short period of time;

That, beginning April, 1957 and continuing thereafter, property surround-

ing plaintiff's property was acquired, buildings razed, and the land converted into parking facilities for Wayne State University;

That, on December 23, 1960, the Housing Commission for the City of Detroit requested authority from Common Council to submit a General Neighborhood Renewal Application to the Federal Government;

That, on January 17, 1961, the Housing Commission for the City of Detroit requested authority from Common Council to submit to the Federal Government an Application for Survey and Planning Funds for "University City, Project No. 1";

That, on February 21, 1962, the Survey and Planning Application as submitted by the Housing Commission for the City of Detroit was approved by the Federal Government;

That, on March 30, 1962, a contract was entered into between the Federal Government and the City of Detroit;

That, on June 25, 1963, after a public hearing, a development plan for "University City, Project No. 1" was adopted by the Common Council;

That, until the adoption of that plan, the City of Detroit, through its Housing Commission, had taken no action toward the acquisition of any property within the "University-City" area;

That, in February, 1964, the City of Detroit entered into a loan and grant contract with the Federal Government to finance the acquisition of said property within the "University-City" area;

That, on or about July 27, 1964, the City of Detroit initiated eminent domain proceedings for the acquisition of the subject property;

That, said property was acquired by the City prior to any trial for the sum of Sixty-Six Thousand ($66,000.00) Dollars.

As to the appraisal and tax assessment of plaintiff's property, it is either stipulated or undisputed by the parties:

That, between the years 1954 to 1960, the defendant City maintained an assessed valuation on the subject property in the amount of One Hundred Eight Thousand Fifty ($108,050.00) Dollars, between the years 1961 through 1963, an assessed valuation of One Hundred Three Thousand, Seven Hundred Thirty ($103,730.00) Dollars, and in 1964 an assessed valuation of Ninety-Eight Thousand One Hundred Forty ($98,140.00) Dollars;

That, between the years 1962 through 1965, plaintiff paid an average of over Five Thousand ($5,000.00) Dollars per year in real and personal property taxes on the subject property;

That, a request by plaintiff dated February 22, 1962 for a reduction in the tax assessment of the subject property was denied;

That, on or about June 1, 1962, a real estate appraiser was hired by the City of Detroit to appraise the subject property for purposes of acquisition by said City, and, on or about July 9, 1962 said appraiser returned an opinion of value of the subject property in the amount of Seventy-Nine Thousand Five Hundred ($79,500.00) Dollars;

That, on or about February 1, 1964, a second real estate appraiser was retained by the City of Detroit to appraise the subject property, and, on or about March 3, 1964, said appraiser returned an opinion of value of the subject property in the amount of Forty-Nine Thousand ($49,000.00) Dollars.

This Court finds, from the uncontroverted testimony introduced by plaintiff, that plaintiff's property was originally located in a primarily residential area within short distances from commercial shopping, restaurants, gas stations, and local business establishments. The subject property was easily accessible by way of two freeways. Beginning April, 1957, the property surrounding plaintiff's building, especially the commercial establishments such as stores and shops, etc., were systematically demolished in

accord with the expansion plans of Wayne State University. As demolition proceeded, the area lost its residential characteristics, and people began moving away from plaintiff's building; such exodus was augmented by information and circulars made available through official sources to the remaining residents informing that the area was subject to eventual condemnation. Plaintiff, himself, was repeatedly informed that his property was shortly to be acquired. Beginning 1957, there was general deterioration of the entire area and in particular of the subject property; access to plaintiff's building was impeded by the blocking of streets thereby requiring awkward maneuvering and circuitous routes to be taken in reaching said property. The property became the object for vandals, and despite repeated requests to the Police Department for additional protection, no safeguards were forthcoming. The president of plaintiff's corporation, Samuel Barak, was, on one occasion, robbed and physically assaulted on the subject premises. Money for improvements became completely unavailable to plaintiffs. As a result of the foregoing, by June, 1962, plaintiff's property had become a complete financial loss. Upon institution of the condemnation proceedings in 1965, plaintiff was provided an offer by Defendant City of Sixty-Six Thousand ($66,000.00) Dollars for the property, and it was implied that if such was not accepted the City would discontinue its acquisition of said property allowing plaintiff to retain ownership of a then deteriorated item.

In addition to this the Court finds from uncontroverted and undisputed testimony of plaintiff's highly qualified real estate expert,* who upon occasion is employed by the City of Detroit for appraisal purposes, that the value of the subject property in 1962 was One Hundred Six Thousand ($106,000.00) Dollars. This expert explained the varying methods employed by him in arriving at a fair evaluation of the property's value, and further explained which of those methods he chose to rely upon in offering his opinion of the true value of the property as it was in 1962. As defendant did nothing to contradict the testimony of this expert, the Court finds that the value of the property in 1962, was, in fact, One Hundred Six Thousand ($106,000.00) Dollars. Even though this value, as testified to by the expert appraiser, included consideration for rental value of a sign on the building which sign, if erected, would have amounted to a nonconforming use under the Zoning Ordinances of the City of Detroit, the expert appraiser testified that, had he been employed by the City of Detroit to appraise said property, the value for such nonconforming use would have been a consideration in his appraisal. As this testimony was not contradicted, it appears to be the normal practice when appraising to consider such adaptable uses be they conforming or nonconforming with Zoning Ordinances.

It was the uncontroverted testimony of an expert certified public accountant, who testified on behalf of plaintiff, that the damages suffered by plaintiff with interest thereon would amount to One Hundred Eight Thousand Thirty-Three and 54/100 ($108,033.54) Dollars.

## OPINION

It is the opinion of this Court, based on the above findings of fact that on or about June, 1962 the conduct of the City of Detroit amounted to a "taking" of plaintiff's property. Thereafter, plaintiff's continued ownership constituted a financial liability rather than an asset.

It was at that point that the acts of defendant City in permitting extensive delay in the known eventual acquisition of plaintiff's property, in failing to safeguard said property so as to prevent its deterioration, in making impractical almost impossible plaintiff's protection of the property, in removing from the

* R. Dean Nelson.

vicinity all indicia of a residential area, in preventing the continued use and enjoyment of the property as a residential building by making said property inaccessible, and in effectively negating the possibility of resale because of published threats of condemnation, culminated in drastic diminution in the value of plaintiff's property.

It has been suggested that these failures alone would not amount to a wrong on the part of Defendant City. But added to the incidents enumerated above were certain official acts which this Court finds were calculated to mark the subject property as prey for the bulldozer and which had the effect of tying the owner to the building thereby negating any bargaining position normally available to a businessman in relationships with the market, prospective buyers, banks, builders and the like. These acts by Defendant City consisted in its issuance of directives denying building permits, in its denial to grant any reassessment for tax purposes in the appraised value of plaintiff's property, in its distribution of circulars and continued publication of information concerning the renewal project and the area it encompassed, in its denial to plaintiff of many if not all City services. Indeed, the City of Detroit had officially entered the scene much earlier than 1962.

Plaintiff's property was plagued by threats of condemnation beginning with the original expansion plans announced by Wayne State University; the black crepe was hung with each published news report concerning the renewal project, each circular to those in the vicinity concerning eventual acquisition, each demolition of a nearby building, each denial of normal services and safeguards. No *lis pendens* on file ever provided a more effective notice to the public to avoid dealings with "the plagued"; no actual condemnation proceeding ever carried any greater finality from a business standpoint than a constant, powerful, capable and continuously published threat of condemnation. Initiation of eminent domain proceed-

ings is not a requisite to a finding that a "taking" has in fact occurred allowing for recovery by a property owner. See Pearsall v. Board of Supervisors of Eaton County, 74 Mich. 558, 42 N.W. 77; Ranson v. City of Sault Ste. Marie, 143 Mich. 661, 107 N.W. 439; Grand Trunk Western Railroad Company v. City of Detroit, 326 Mich. 387, 40 N.W. 2d 195; Long v. City of Highland Park, 329 Mich. 146, 45 N.W.2d 10.

The totality of these acts by the Defendant City contributed to and accelerated the decline in value of plaintiff's property in 1962 so as to constitute a "taking" of that property within the meaning of the 5th Amendment to the United States Constitution. For such "taking", just compensation must be paid to plaintiffs. See Foster v. City of Detroit (D.C.1966) 254 F.Supp. 655; (6 Cir. 1968) 405 F.2d 138.

Defendant City argues that plaintiff received just compensation by settlement of this matter in 1965. Yet, what does one do with "plagued" property but await the mercy of officials, who, after permitting the decay to progress, dole out bad medicine on a take it or leave it basis. At the time that plaintiff accepted his award from the City, the law of the State of Michigan was " 'to find the value of the property at the time of taking, which is the time of your verdict and no other time' ". In re Urban Renewal Elmwood Park (1965) 376 Mich. 311, 314, 136 N.W.2d 896, 898. Plaintiffs, aware of that existing law, conceded the property's 1965 value as Sixty-Six Thousand ($66,000.-00) Dollars and accepted the award. No additional loss could then be tolerated.

The state later changed its approach, however, and held that the time of a taking is a matter for the trier of fact in each case. The Supreme Court of the State of Michigan held that:

" * * * Where condemnation proceedings are protracted, the whole character of an area may be changed to the detriment of the property owner during the course of the proceed-

ings. If an area has been made a waste land by the condemning authority, the property owner should not be obliged to suffer the reduced value of his property. The converse is also true. When condemnation proceedings tend to increase the value of the property, the property owner is not entitled to the increased value." See In Re Urban Renewal Elmwood Park, *Supra*, p. 318, 136 N.W.2d p. 900.

Plaintiff, by accepting the Sixty-Six Thousand ($66,000.00) Dollars was obliged to suffer the reduced value on this property. It is the opinion of this Court that the value of plaintiff's property as of the date of the "taking" in 1962, as provided by the uncontradicted testimony of plaintiff's expert appraiser, was One Hundred Six ($106,000.00) Dollars. Said value may properly include a consideration of uses to which the property may be adapted, See City of Allegan v. Vonasek (1932) 259 Mich. 310, 243 N.W. 14, especially when said factors would be taken into consideration upon appraisals made for and on behalf of Defendant City itself.

■ There was no monetary accrual to plaintiff from his continued possession of the property from 1962 the date of the taking through 1965; to the contrary, plaintiff suffered a loss by virtue of his possession and was, in addition, required to make continual payments for tax assessments on the property. Such taxes constitute an expense resulting from the continued maintenance and upkeep of the property, for which expense plaintiff is entitled to additional compensation from Defendant City. See *Cassesse, Supra* (In Re Urban Renewal Elmwood Park).

In conclusion, plaintiff is entitled to recover from Defendant City, the difference between the value of the property in 1962 i. e., One Hundred Six Thousand ($106,000.00) Dollars, and the amount actually paid upon acquisition in 1965, i. e., Sixty-Six Thousand ($66,000.00) Dollars with appropriate interest thereon; in addition plaintiff is entitled to recover those amounts expended as the

result of the continued possession of the property between the years 1962 through 1965, including taxes paid and out of pocket amounts expended, with appropriate interest thereon.

The parties in this matter will be given ten (10) days in which to compute the amount of the award to plaintiff and submit said computation to the Court for entry of final judgment in this matter. In the event that agreement on said computation cannot be reached within Ten (10) days, the Court will make said computation and prepare final judgment.