CITY OF ESSEXVILLE v CARROLLTON CONCRETE MIX, INC

Docket No. 239807. Submitted September 10, 2003, at Lansing. Decided November 4, 2003, at 9:00 A.M. Leave to appeal sought.

The city of Essexville brought an action in Bay Circuit Court against Carrollton Concrete Mix, Inc., to enforce use restrictions imposed on the defendant's waterfront property pursuant to a 1983 zoning ordinance, which rezoned the defendant's property from industrial to a development district, pursuant to recommendations contained in the city's 1982 development plan. Uses permitted in the development district were essentially limited to recreational or public uses, but at the time the action was filed in 1999, the defendant's property was being used for a dredging operation in the Saginaw River. Previously, the defendant's property had been sporadically used as a site for ships to unload and store cargo before making their way upstream. After a bench trial, the circuit court, William J. Caprathe, J., concluded that the city's ordinance rezoning the property was reasonable in light of the city's development plan to provide more community access to the river, and that the defendant had not established that the rezoning deprived the property of all or substantially all of its value. The circuit court also concluded that the defendant had established certain nonconforming uses, including the unloading and storage of cargo and equipment for dredging purposes. The city and the defendant filed motions for a new trial. The circuit court granted the defendant's motion and entered judgment in its favor, concluding, contrary to its earlier decision, that there was no reasonable basis for the rezoning and that the city had improperly "spot zoned" the defendant's property. The city appealed.

The Court of Appeals held:

The two lines of case law the circuit court relied on, first in finding the city's rezoning lawful, and then in finding that it constituted unlawful spot zoning, are consistent in espousing a deferential standard of review regarding a city's zoning decision, and the holdings may be summarized as follows. When a local governing body validly enacts a zoning ordinance, the courts must take a deferential role in reviewing claims that such decisions are unreasonable and arbitrary. This is consistent with the Supreme Court's repeated

statements that such ordinances are clothed with a presumption of validity, and that it will be a rare case that results in judicial intervention. But when a discrete zoning decision is made regarding a particular parcel of property that results in allowing uses for specific property that are inconsistent with the overall development plan as established by ordinance, the courts will apply greater scrutiny. In this case, however, the circuit court erred in holding that the city's 1983 zoning ordinance constituted spot zoning. First, the circuit court erred by failing to apply the deferential standard of review established by the Supreme Court in its prior decisions. Second, contrary to the circuit court's finding, the defendant's property was not the only industrial riverfront property to be rezoned by the city for the purpose of obtaining access to the river. Finally, it is undisputed that the 1983 zoning ordinance being enforced was enacted after careful consideration of the city's development plan, and constituted a decision by the city's duly elected representatives regarding how the city waterfront should be developed in the future. Thus, the determination was not inconsistent with the overall zoning plan, and did not constitute "spot zoning." The decision by the circuit court must be reversed. However, to the extent that the circuit court did not address the issue whether the purpose of the rezoning of the defendant's property was to improperly depress its property value so that the city could purchase it at a later date, the matter must be remanded to the circuit court for a factual finding regarding this issue.

Reversed and remanded for further proceedings.

*Gerald W. Pergande* for the plaintiff.

*Darbee, Bosco & Hammond, P.C.* (by *James M. Hammond*), for the defendants.

Before: SAWYER, P.J., and HOEKSTRA and MURRAY, JJ.

MURRAY, J. Plaintiff, the city of Essexville, appeals as of right from the final order entered by the trial court in favor of defendant, Carrollton Concrete Mix, Inc.[1] The final order embodied the trial court's con-

---

[1] Other defendants are Carrollton Concrete Mix, Carrollton Paving Co., and Carrollton Concrete Mix Co. We will refer to all of these defendants as "Carrollton" since their separate corporate identities have no bearing on the issues in this case.

clusion that the city had engaged in illegal "spot zoning" when, in 1983, it rezoned Carrollton's property along the Saginaw River from M-1, industrial, to D-1, development district. The city argues on appeal that it had a reasonable basis for the rezoning, that the zoning decision was made pursuant to its master plan, and that its decision was not arbitrary. We agree, in part, and we reverse the trial court's order ruling that the city engaged in spot zoning, and remand for further proceedings consistent with this opinion. On remand, the trial court shall determine whether the purpose of the rezoning was to lower the market price of Carrollton's property in anticipation of the city making an offer to purchase the property.

## I. MATERIAL FACTS

At the heart of this zoning dispute is Carrollton's 4.37 acres of Saginaw River waterfront property. In 1955, this property was zoned as commercial. In 1966, a zoning amendment changed the property's use to M-1 industrial.[2] Since at least the 1970s, the property has been primarily available for use as a "lightering dock," which permits ships moving upstream to lighten their loads by depositing some of their cargo onto the property, which allows the "lightened" ships to more safely traverse lower river depths.

The property is bordered to the east by Main Street, while to the west it is bordered by a railroad, and to the south by Smith Park, a public park. The northern border of the property consists of approxi-

---

[2] It is undisputed that until the new zoning ordinance took effect in 1983, all Saginaw River waterfront property within Essexville was zoned either light or heavy industrial.

mately eight hundred feet of river frontage. The northeasterly, adjacent property is a cement plant, and to the northeast of the cement plant, there are two separate vacant parcels bordering the river, which are owned by the cement company. The land lying southwest and adjacent to Carrollton's property encompasses Smith Park and a city sewage disposal plant. Farther southwest of those properties is Wirt Stone Dock.

In March 1982, a comprehensive development plan was completed by the city. The development plan was based on an engineering proposal prepared for the city. The plan contained a detailed analysis of public opinion, an examination of the city's demographics at that time and historically, and recommendations to meet the current needs and demands of the community. In particular, the plan centered on the fact that the city had evolved over time, from once being its own economic base to being a residential suburb of the Bay City metropolitan area. In accordance with the residential character of the city, public opinion focused on improving the community's character through commercial beautification and development of residential and recreational properties along the river. With respect to riverfront development and usage, the plan recommended that certain property along the river, including Carrollton's property, be rezoned to promote the eventual development of recreational and residential uses:

> Industrial market potential, however, is considerably greater than the citizens' apparent desires. The City of Essexville has an attractive blend of river port frontage and rail access to serve a considerable amount of industrial development. Public opinion would result in the utilization

of this river front property for parks with waterborne activities and for intensive residential development that could utilize access to the Saginaw River. Park development would provide the municipal boat launches, with a fee for non-residents. Associated commercial activities could result in—in the vicinity of the park to promote recreational marine activities. The Park and recreational development, in conjunction with downtown beautification, could promote an improved image for the City of Essexville that could be utilized to promote some office business activities along Woodside Avenue as well.

The plan listed a number of deficiencies in recreational opportunities within the city and suggested that Smith Park be expanded to correct the deficiencies. The plan suggested that Carrollton's property, which is "adjacent to and east of Smith Park, would provide an excellent location to improve water-oriented recreation for Essexville residents." The plan explained the need to expand Smith Park by purchasing the property in dispute:

As identified more specifically in greater detail in the coastal zone management plan, special consideration of river access and water front recreation are highly desirable objectives. Purchasing the site northeast of Smith Park will provide the opportunity for the City to realize this objective.

The plan made clear that, "It is the intent, in fact, for the City to acquire, by acquisition or private agreement, access and recreation sites along the Saginaw River." In the city of Essexville's long-range land use map, which was a part of the plan, Carrollton's property was identified as land suitable for parks and recreation.

On May 24, 1983, the Essexville Zoning Ordinance was amended, changing the zoning of Carrollton's property from industrial to a development district, pursuant to the plan. Also rezoned from industrial to development district were the two vacant lots to the northeast of (and owned by) the cement plant. Permitted uses in the development district generally consisted of public and recreational facilities.[3] In particular, the zoning ordinance allowed the following activity within a development district:

> A. General farming and forestry including field crop and fruit farming, truck gardening, horticulture, tree nurseries and similar agricultural activities.
> B. Public and private conservation areas and structures for the conservation of water, soil, open space, forest or wildlife resources.
> C. Public and private parks and recreational facilities that utilize environmental or natural resource conditions as a basis for recreation.

Additionally, under the ordinance, several other types of uses were permitted by special land use permit, including planned unit developments, mobile home parks, townhouses, apartments and condominiums, wholesale and distribution facilities, and certain storage and distribution facilities.[4]

---

[3] Testimony at trial tended to establish that, since 1990, the property has been sporadically utilized. For example, in 1990, Bay Aggregate started using the property for lightering after the shipping channel was blocked when a freighter caught on fire. Additionally, International Materials utilized the property for lightering purposes, and placed its own truck scales on the property. However, after both Bay Aggregate and International Materials utilized the property in this fashion, the city sent a letter to Carrollton requesting that the nonconforming use be discontinued.

[4] We note that in 1989, many years *after* the ordinance was enacted, the city adopted a recreation plan, which set forth the city's recreational development plan for the next decade. In that plan, it was reported that

At the time of trial, the property was being used for a dredging operation in the Saginaw River. The dredging operation began in the fall of 1999, and in January 2000, there were two piles of bulk material approximately thirty feet high being stored in disregard of the zoning ordinance. The city sent Carrollton two letters requesting that it discontinue what the city considered to be an illegal nonconforming use. These letters did not result in the removal of the bulk material. In order to seek compliance with the zoning ordinance, the city filed suit seeking an injunction against Carrollton's activities.

## II. THE TRIAL COURT'S DECISIONS

On June 22, 2001, following a four-day bench trial, the trial court made its initial decision. Specifically, at the conclusion of the bench trial, the court ruled, relying primarily on *Brae Burn, Inc v Bloomfield*

---

eighty-six percent of city residents responding to a survey felt the need to expand recreational development along the waterfront. The plan reiterated the need to continue to pursue purchasing Carrollton's property to expand Smith Park and ease the pressure on the only two launch sites within the city. The plan specifically states that one of its objectives is to "[a]cquire the vacant property immediately adjacent to the existing Smith Park for expansion of the boat launching facilities and boat trailer parking facilities." The plan also contains a proposal to spend $350,000 for "property purchase."

Consistent with the development plan and the 1989-1999 recreation plan, the city's 1997 parks and recreation master plan recommended that Smith Park be renovated as a waterfront park to include a new fishing pier and river walk extending from the Smith Park boat launch to the western property limits of the park; a new, modular children's adventure play structure; and a pavilion. The waterfront redevelopment program, created in October 1997, indicated that Carrollton was holding the property in case of future disruption in shipping activity farther south on the river. The redevelopment program proposed the relocation of Carrollton's business to an industrial agricultural park. This information was not, obviously, available to the city council that passed the zoning ordinance in 1983.

*Hills*, 350 Mich 425; 86 NW2d 166 (1957), and *Kropf v Sterling Hts*, 391 Mich 139; 215 NW2d 179 (1974), that the presumptively valid zoning ordinance was reasonable in that the city was acting pursuant to a comprehensive master plan and rezoned the parcel "so that it would [allow] more access to the river by the community. And that could be accomplished in other ways than [by] positioning a park there." The court summarized this finding as follows:

> So . . . their intent was broader than just to re-zone it so that it could become a park; their intent was that it be rezoned so that it would have some use that make it or— more accessible to members of the community than the use that it was being put to at the time.

The trial court also concluded that Carrollton did not prove that the rezoning "deprived the property of all of its value or substantially all of its value."

The trial court went on to conclude that Carrollton had established certain nonconforming uses as of the effective date of the zoning ordinance, May 24, 1983. Specifically, the court held that Carrollton could continue with (1) the storage and removal of its own stone and gravel, (2) lightering activity by Carrollton, and (3) the dockage or storage of equipment for dredging purposes by Carrollton or by third parties. A permanent injunction to this effect was entered by the trial court.

Both parties moved for a new trial. After hearing oral argument, the court issued a written opinion and order holding that (1) the city clearly singled out Carrollton's property to be used as a park when the surrounding land was designated as industrial, (2) the land surrounding Carrollton's property was not con-

sidered for rezoning because it was being utilized to full capacity as lightering docks, (3) there was no reasonable basis for the rezoning "other than that the City wanted river access," and (4) because there was no reasonable basis for the rezoning, it was invalid. In making this final ruling, the court relied on *Penning v Owens*, 340 Mich 355; 65 NW2d 831 (1954), and *Anderson v Highland Twp*, 21 Mich App 64; 174 NW2d 909 (1969), so-called "spot zoning" cases. Hence, the trial court's decision resolving the motions for new trial was directly opposite to the decision it rendered immediately after the bench trial.

### III. ANALYSIS

In this appeal from a decision following a bench trial, we review the trial court's findings of fact for clear error. *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 651; 662 NW2d 424 (2003). "A finding is clearly erroneous where, although there is evidence to support the finding, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." *Id.* at 652. The trial court's legal conclusions are, of course, reviewed de novo. *The Detroit News, Inc v Policemen & Firemen Retirement Sys of Detroit*, 252 Mich App 59, 67; 651 NW2d 127 (2002).

The power to zone and rezone property is a legislative function. *Schwartz v Flint*, 426 Mich 295, 307-308; 395 NW2d 678 (1986). Cities derive their zoning authority from state enabling statutes, such as the City and Village Zoning Act, MCL 125.581 *et seq. Paragon Properties Co v Novi*, 452 Mich 568, 574; 550 NW2d 772 (1996); *Lake Twp v Sytsma*, 21 Mich App 210, 212; 175 NW2d 337 (1970). In the instant

case, the trial court first ruled, relying on *Brae Burn*, *supra*, that the city's actions were lawful. Thereafter, however, the court came to the opposite conclusion, relying on *Penning*, *supra*. Thus, in order to properly resolve this dispute, we must determine whether the *Penning* and *Anderson*, *supra*, cases contain separate zoning principles apart from those set forth in *Brae Burn* and *Kropf*, *supra*, and if so, which line of cases controls.

In *Brae Burn*, *supra*, two separate actions involving the same parcel of property were consolidated in the trial court. *Brae Burn*, *supra* at 428. The property at issue was zoned residential and abutted Woodward Avenue in the city of Bloomfield Hills. In one suit, Brae Burn, a Michigan corporation operating a rest home on the property (for which a zoning variance was previously granted), applied to the city to expand the size of the home, which the city denied. In the second suit, the property owner sought to build a three-story office building on the property south of the rest home, along Woodward Avenue.[5] The city denied this request, in part, because the property was zoned residential. *Id.* Both plaintiffs sought a writ of mandamus from the circuit court. The trial court issued the writs in both cases, concluding that the limitations placed on the property by the city were arbitrary, discriminatory, and unconstitutional. *Id.*

The Supreme Court reversed. After concluding that the zoning ordinance was validly adopted, *id.* at 430,[6]

---

[5] The property owner had conveyed 14.5 acres to Brae Burn to operate the rest home, and retained the remaining 25.5 acres he owned along Woodward Avenue.

[6] In the present case, neither party disputes that the 1983 zoning ordinance was validly enacted.

the Court turned to the city's zoning decision. In doing so, the Court reiterated the time-honored principle that courts do "not sit as a superzoning commission," since the laws of this state grant the people's locally elected representatives decision-making authority regarding how their community will be developed and organized:

> [W]e deem it expedient to point out again, in terms not susceptible of misconstruction, a fundamental principle: this Court does not sit as a superzoning commission. Our laws have wisely committed to the people of a community themselves the determination of their municipal destiny, the degree to which the industrial may have precedence over the residential, and the areas carved out of each to be devoted to commercial pursuits. With the wisdom or lack of wisdom of the determination we are not concerned. The people of the community, through their appropriate legislative body, and not the courts, govern its growth and its life. Let us state the proposition as clearly as may be: It is not our function to approve the ordinance before us as to wisdom or desirability. For alleged abuses involving such factors the remedy is the ballot box, not the courts. We do not substitute our judgment for that of the legislative body charged with the duty and responsibility in the premises. [*Id.* at 430-431.]

A necessary corollary of this principle, the Court continued, was that ordinances come to courts "clothed with every presumption of validity," and that it is "the burden of the party attacking to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of his property." *Id.* at 432, citing *Hammond v Bloomfield Hills Building Inspector*, 331 Mich 551; 50 NW2d 155 (1951), and *Janesick v Detroit*, 337 Mich 549; 60 NW2d 452 (1953). Although noting that a zoning body

may not "with impunity abrogate constitutional restraints," the Court held that to successfully challenge a zoning ordinance it "must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit*, and that there is no room for a legitimate difference of opinion regarding its reasonableness." *Brae Burn, supra* at 432. Under this deferential standard of review, successful challenges will be limited to "extreme" cases. *Id.*

Even more bluntly, the Court posed this as the pivotal question to be answered by a reviewing court:

> The question always remains: As to this property, in this city, under this particular plan (wise or unwise though it may be), can it fairly be said there is not even a debatable question? If there is, we will not disturb. [*Id.* at 433.]

On the basis of the facts before it, the *Brae Burn* Court reversed the trial court in both cases, concluding that the city's legislative body had not acted in a whimsical manner in zoning the property residential, that the property was not unsuited for its zoned use, and that the city's action was not confiscatory. *Id.*

The Court also rejected the plaintiffs' argument that the zoning was unreasonable and arbitrary because another office building was located nearby, and another rest home was across the street. The Court considered these issues to be peripheral ones that will always arise in zoning matters, and that, except in those rare cases, the local legislative bodies, not the courts, are the proper bodies to resolve these issues. *Id.* at 437-438.

Although only four justices concurred in the reasoning of *Brae Burn*,[7] since then, a majority of the Court has adopted and applied its deferential standard of review to zoning challenges. See, e.g., *Delta Charter Twp v Dinolfo*, 419 Mich 253, 268; 351 NW2d 831 (1984); *Kropf, supra* at 161-162; *Bowman v Southfield*, 377 Mich 237, 246-247; 140 NW2d 504 (1966). Our Court has, of course, followed this binding precedent. *Selective Group, Inc v Farmington Hills*, 180 Mich App 595, 598-599; 447 NW2d 817 (1989).

In *Delta, supra*, the Supreme Court set forth the two separate avenues of proof that a party may utilize in challenging a zoning ordinance on the basis that the land was not reasonably zoned in comparison to other possible zoning classifications:

"The important principles require that for an ordinance to be successfully challenged plaintiffs prove:

" '[F]irst, that there is no reasonable governmental interest being advanced by the present zoning classification itself * * * or

" '[S]econdly, that an ordinance may be unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question.' " [*Id.* at 268, quoting *Kropf, supra* at 158.]

The *Delta* Court also summarized the four principles that courts are to utilize when reviewing a plaintiff's challenge under either of the two methods of proof:

"1. ' "[T]he ordinance comes to us clothed with every presumption of validity." '

---

[7] Under the Michigan Constitution of 1908 and its implementing legislation, there were seven associate justices and one chief justice. See Const 1908, art 7, § 2; 1948 CL 601.1.

"2. ' "[I]t is the burden of the party attacking to prove affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of his property * * *. It must appear that the clause attacked is an arbitrary fiat, a whimsical *ipse dixit*, and that there is no room for a legitimate difference of opinion concerning its reasonableness." '

"3. 'Michigan has adopted the view that to sustain an attack on a zoning ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on his property preclude its use for any purposes to which it is reasonably adapted.'

"4. ' "This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases." ' "
[*Id.* (citations omitted).]

See also *Selective Group, supra* at 598-599; *Rogers v City of Allen Park,* 186 Mich App 33, 37-38; 463 NW2d 431 (1990).

As previously noted, in its oral ruling at the conclusion of the bench trial, the trial court followed *Brae Burn* and *Kropf,* holding that the ordinance was not unreasonable in that there were several reasons supporting the decision to rezone. However, in its opinion and order deciding the motions for new trial, the trial court reversed its position, holding that under "spot zoning" cases such as *Penning, supra,* the city had unlawfully spot zoned Carrollton's property. We now turn to those cases to determine whether the trial court erred in reaching this conclusion.

In *Penning, supra,* the plaintiffs brought suit seeking a ruling that an amendment to a township zoning ordinance was null and void. The plaintiffs owned property to the south and east of the defendant's property and, under a 1948 zoning ordinance, all of the parties' property was zoned residential. *Id.* at 358.

In 1952, however, the defendant sought and obtained an amendment to the ordinance, which rezoned the defendant's property to "Commercial 1." *Id.* at 360. The township board cited several reasons for its approval of the amendment, including that the defendant's property adjoined commercial property, was favorably situated for commercial use, and was more valuable as commercial property, along with an apparent rejection of the reasons offered in opposition to the rezoning. *Id.* at 360-361.

The trial court rejected the plaintiffs' challenges to the zoning amendment, but the Supreme Court reversed. The Court did so for several reasons. First, the Court held that the township board improperly relied on an adjacent nonconforming commercial use to grant the amendment. The board erred because the nonconforming use was itself contrary to the township's overall plan of zoning, which called for the entire area to be residential, and the zoning plan was adopted by the township as the best way to protect the health, safety, morals, and general welfare of the community. *Id.* at 366. In this regard, the Court concluded:

> In looking to the adjacent nonconforming use as justification for the rezoning of Owens' 2 lots as commercial, *the township board has acted contrary to the existing plan of zoning.* No substantial change in the character of the area from the time of the adoption of the ordinance is asserted in support of adoption of a new plan of zoning. [*Id.* (emphasis added).]

Second, the Court held that the fact that the property might be more valuable zoned another way was a singularly insufficient factor distinguishing the defendant's property from the other residential properties.

*Id.* at 367. Finally, the Court held the zoning amendment invalid as contrary to the existing zoning plan, as it created an isolated commercial zone within an otherwise validly determined residential zone, referring to it as "spot zoning":

> Upon a careful examination of the record we are of the opinion that the action of the township board was arbitrary and unreasonable and *not in keeping with a plan of zoning* as required by the enabling statute. A zoning ordinance or amendment of the present type creating a small zone of inconsistent use within a larger zone is commonly designated as "spot zoning." See annotations in 128 ALR 740 and 149 ALR 292, and the cases cited therein. Such an ordinance is closely scrutinized by a court and sustained only when the facts and circumstances indicate a valid exercise of the zoning power. Economic gain to the landowner is insufficient reason for invoking the amending power of the township board when the property is capable of full use within the limitations for which it is zoned. *We find no other grounds justifying* the creation of a 2-lot commercial district almost entirely surrounded by a residential area. It is evident that the amendment creating the commercial district was a means of circumventing the statutory requirement that the provisions within a zoning district be uniform.[8] [*Id.* at 367-368 (emphasis added).]

*Anderson, supra,* was the other case relied on by the trial court in finding that the city spot zoned Carrollton's property. In that case, the principal issue was the validity of the township's 1960 zoning ordinance and its 1967 amendment, which zoned the plaintiffs' property "agricultural" but allowed the use of tempo-

---

[8] The statute referred to, MCL 125.271, applies to townships, not cities. Moreover, the statute empowering city planning commissions does not contain the same language regarding uniformity among districts as does the township zoning act. Compare MCL 125.271 to MCL 125.36 and MCL 125.37.

rary trailers by farmhands, and which precluded trailer or mobile home parks except in certain circumstances. *Id.* at 71-74. Although a ruling on that issue was dispositive of the appeal, this Court made the alternative ruling[9] that the township could not decide on an ad hoc basis whether a particular trailer park application should be granted, as this "would result in illegal spot zoning." *Id.* at 75. Quoting 8 McQuillin, Municipal Corporations (3d ed), § 25.83, pp 223-224, this Court accepted the following definition of spot zoning:

> "Although not denounced by any hard and fast rule, zoning in a *haphazard manner* is not favored and, on the contrary, zoning should proceed in accordance with a definite and reasonable policy. Thus, a zoning ordinance or an amendment of a zoning ordinance to permit *piecemeal or haphazard* zoning is void, and so-called 'spot zoning,' *where it is without a reasonable basis,* is invalid. The legislative intention in authorizing comprehensive zoning is reasonable uniformity within districts having in fact the same general characteristics and not the marking off, for peculiar uses or restrictions of small districts essentially similar to the general area in which they are situated." [*Anderson, supra* at 75 (emphasis added).]

We read the holding of *Penning* and the dicta of *Anderson* to be consistent with *Brae Burn* and its progeny. In neither *Penning* nor *Anderson* did the courts disavow the deferential standard of review forcefully declared in *Brae Burn* and other cases. Moreover, both *Penning* and *Anderson* denounced "haphazard," "piecemeal" zoning decisions that were

---

[9] Hence, it was dicta because it was unnecessary for the resolution of the case. *Dressel v Ameribank,* 468 Mich 557, 568 n 8; 664 NW2d 151 (2003).

contrary to existing zoning plans, which is consistent with the "reasonable and arbitrary" test set forth in *Brae Burn* and other cases. *Brae Burn, supra* at 432; *Delta, supra* at 268. See also *Grand Trunk W R Co v Detroit*, 326 Mich 387, 399; 40 NW2d 195 (1949) (rejecting the defendant's argument that spot zoning cases are distinguishable from generally applicable zoning laws). Indeed, the *Brae Burn* Court indicated that those rare cases that require judicial intervention would involve "whimsical" legislative decisions. *Brae Burn, supra* at 437.

We believe the holdings in *Brae Burn, Kropf*, and *Penning* can be summarized as follows: When a local governing body validly enacts a zoning ordinance, the courts must take a deferential role in reviewing claims that such decisions are unreasonable and arbitrary. That is why our Supreme Court has repeatedly held that such ordinances are clothed with a presumption of validity, and that it will only be the rare case that results in judicial intervention. After all, "[w]e do not see the land, we do not see the community, we do not grapple with its day-to-day problems." *Brae Burn, supra* at 436-437. But, when a discrete zoning decision is made regarding a particular parcel of property—typically a decision involving an amendment or variance that results in allowing uses for specific land that are inconsistent with the overall plan as established by the ordinance—the courts will apply greater scrutiny. *Penning, supra*. Those isolated or discrete decisions are more prone to arbitrariness because they are micro in nature, i.e., the decisions are based on the particular land and circumstance at issue in the request for amendment or variance. To the contrary, macro decisions made by the local

body, such as the enactment of a new zoning ordinance, typically reflect a decision on how the city will be developed in the years to come, i.e., are made pursuant to an overall plan of action.

In this case, we conclude that the trial court erred in holding that the city's 1983 zoning ordinance constituted spot zoning. There are several reasons for this conclusion. First, the trial court erred by concluding that it should not have applied the *Brae Burn* and *Kropf* cases, involving "general principles of reasonableness," as opposed to *Penning* and *Anderson*, involving "arbitrariness of zoning ordinances." As noted above, the standard of review remains the same regardless of which cases are applied to the particular facts or theories before the court, and the trial court's implicit failure to adhere to the *Brae Burn* standard of review was error.

Second, the trial court concluded that the city engaged in spot zoning on the basis of a single finding of fact—that the city chose *only* Carrollton's property to rezone[10] for the sole purpose of obtaining river access. This was error, both factually and legally. Factually, the evidence was undisputed that through the 1983 zoning ordinance, Carrollton's property was not the only industrial riverfront property rezoned to a development district. The two vacant lots northeast of the cement plant were also rezoned. And, as

---

[10] At one point in its decision, the court stated that the city's zoning "as amended" was invalid. However, there was no zoning amendment at issue in this case. Rather, the zoning was pursuant to the entirely new 1983 zoning ordinance. This distinction is important, since as noted above, the city's decision was pursuant to an overall development plan, containing a plethora of information relative to the makeup and needs of the community. Such planned zoning decisions are the antithesis to a spot zoning decision.

explained below, a finding that the city chose to rezone waterfront property for "river access" does not support a finding that the city engaged in spot zoning.

Third, the trial court disregarded the undisputed fact that the zoning being enforced was the original 1983 zoning ordinance.[11] That zoning ordinance was enacted after consideration of the city development plan, and constituted the elected representatives' decision regarding how the city landscape, including the waterfront, should be developed in the future. Thus, contrary to the situations in *Penning* and *Anderson*, the city's zoning determination was not made pursuant to an isolated zoning amendment or variance that was inconsistent with the overall zoning plan, and therefore cannot be compared to a "haphazard" or "piecemeal" decision. Instead, the city was seeking to enforce a zoning provision enacted over fifteen years earlier, which provision was based on reflection and a reasonable plan for opening up riverfront property to nonindustrial uses. Additionally, the evidence clearly established that these parcels were zoned as development districts because they were essentially vacant parcels. Our Supreme Court, as well as this Court, has recognized that courts "may consider a master plan as a general guide for future development." *Bell River Assoc v China Charter Twp*, 223 Mich App 124, 131; 565 NW2d 695 (1997), citing *Biske v Troy*, 381 Mich 611, 619; 166 NW2d 453 (1969), and *Troy Campus v Troy*, 132 Mich App 441, 457; 349 NW2d 177 (1984). The development plan drawn up for the city led to the enactment of the 1983

---

[11] We are unable to discern why the trial court mentioned a "1996 amendment," as neither we nor the parties have located any amendment to the 1983 zoning ordinance that affected Carrollton's property.

zoning ordinance, and contains a reasonable plan for phasing in nonindustrial properties along the riverfront. The city's decision to enact such a plan, the reasons in support of which are at least minimally "debatable," cannot be overturned by the courts on the basis that it was not the best decision. *Brae Burn, supra.* We are also unaware of any case law requiring a municipality to rezone an entire waterfront all at once.[12]

Carrollton places great reliance on *Michaels v Village of Franklin,* 58 Mich App 665; 230 NW2d 273 (1975). In that case, the trial court overturned a local village's decision not to grant a zoning amendment, which would have rezoned a vacant parcel from residential to commercial. The village council opined that the land should be public, and that the village should endeavor to purchase it from the plaintiffs. The trial court held that the village's decision was unreasonable, and this Court affirmed. In doing so, this Court referred to the controlling *Brae Burn* standard of review, *id.* at 671, but nevertheless upheld the trial court's decision because the evidence established that the parcel was unsuitable for residential use, *id.* at 674-675. However, nowhere does the *Michaels* decision contain a discussion of spot zoning, nor is there a suggestion that the decision was "haphazard" or "piecemeal." Accordingly, *Michaels* does not detract from our conclusion that the trial court erred in hold-

---

[12] We note that the city did not sue Carrollton to stop it from engaging in an existing nonconforming use. Rather, the city sought to preclude Carrollton from expanding the nonconforming uses that existed on May 24, 1983. See *Gackler Land Co v Yankee Springs Twp,* 427 Mich 562, 573-574; 398 NW2d 393 (1986).

ing that the city's 1983 zoning ordinance constituted illegal spot zoning.

However, *Michaels* and several other cases do leave one critical question left unanswered: Whether the purpose of the zoning of Carrollton's property was "to depress property values so that at a future date, property may be acquired for public purposes," which action is unlawful. *Michaels, supra* at 674, relying in part on *Grand Trunk, supra* at 397. There was evidence in the record suggesting that in enacting the zoning ordinance, the city intended to eventually purchase the property from Carrollton. However, it also remains undisputed that the city has not voted on any such intention in the years since 1983, and the city only filed the instant case to compel Carrollton's compliance with the existing nonconforming uses. We believe this issue, which was not decided by the trial court, requires a remand of this case for a factual determination. Although this may delay a final resolution of this case, as an appellate court, we are not in a position to determine the credibility of the evidence, much of which was live testimony. Therefore, we reverse the trial court's opinion and order holding that the city unlawfully spot zoned Carrollton's property, but remand to the trial court for further proceedings consistent with this opinion.[13]

Reversed and remanded. We do not retain jurisdiction.

---

[13] Because of our resolution of this case, we need not address the city's argument that the trial court abused its discretion in refusing to admit evidence pertaining to Bay City's zoning. That issue is not relevant to proceedings on remand.