705 N.W.2d 365 (2005)
267 Mich. App. 523
K & K CONSTRUCTION, INC., and J.F.K. Investment Company, LLC, Plaintiffs-Appellees,
v.
DEPARTMENT OF ENVIRONMENTAL QUALITY, Defendant-Appellant.
Docket No. 244455.
Court of Appeals of Michigan.
Submitted April 20, 2005, at Lansing.
Decided July 26, 2005, at 9:25 a.m.
Released for Publication October 26, 2005.
*366 Robert L. Bunting, Oxford, Robert Charles Davis, Sterling Heights, and Richard L. Hoffman, Lake Orion, for the plaintiffs.
Michael A. Cox, Attorney General, Thomas L. Casey, Solicitor General, and S. Peter Manning, Assistant Attorney General, for the defendant.
Before: ZAHRA, P.J., and SAAD and SCHUETTE, JJ.
SAAD, J.
The trial court entered judgment in favor of plaintiffs against defendant. Defendant appeals the judgment, and we reverse and enter judgment in favor of defendant.

*367 I. NATURE OF THE CASE
When a citizen claims that a governmental land-use regulation, or its regulatory implementation, adversely affects the value of his or her property, and seeks just compensation under the Taking Clause of the Fifth Amendment,[1] our courts must decide whether the challenged governmental action, and its consequent effect on private property, constitutes a "regulatory taking" under federal and state taking jurisprudence.
More specifically, when, as here, the government regulates land use  as opposed to taking physical possession of land[2]  and where, as here, the challenged regulation is stipulated to be for the public good, our limited role is to answer the specific constitutional question: where implementation of a valid land use regulation[3] negatively impacts a private citizen's valuable property rights, does the Taking Clause require compensation? To answer this question, our Supreme Court has instructed us to examine the United States Supreme Court's seminal decision in Penn Central Transportation Co. v. New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[4]
*368 The United States Supreme Court in Penn Central laid out a three-factor test for courts to apply to answer this important constitutional question:
[1] The economic impact of the regulation on the claimant and, particularly, [2] the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is [3] the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good. [Id. at 124, 98 S.Ct. 2646 (citations omitted).]
The taking jurisprudence articulated by the United States Supreme Court in Penn Central and its progeny[5] requires that our courts consider the following factors in deciding whether a "regulatory taking" claim is compensable: (1) what is the average reciprocity of advantage, in other words, is the aggrieved property owner singled out to pay for the public good, or is the land-use regulation so universal and ubiquitous that the benefits and burdens of the land-use regulation fall relatively equally among all, including the complaining party; (2) what use could the landowner reasonably expect to make of the land given the state of the land-use regulations at the time of acquisition (as part of this inquiry, it is necessary to take into account whether the landowner knew, or should have known, of the land-use regulation at the time of purchase); and (3) did the specific, challenged application of the land-use regulation leave the property owner valuable land use rights or did it instead render the land virtually worthless?
Stated another way, if the land-use regulation, like traditional zoning and wetland regulations: (1) is comprehensive and universal so that the private property owner is relatively equally benefited and burdened by the challenged regulation as other similarly situated property owners, and (2) if the owner purchased with knowledge of the regulatory scheme so that it is fair to conclude that the cost to the owner factored in the effect of the regulations on the return on investment, and (3) if, despite the regulation, the owner can make valuable use of his or her land, then compensation is not required under Penn Central.
Here, plaintiffs claim that the denial by the Department of Environmental Quality (DEQ) of a permit to fill in the wetland on their property constitutes a regulatory taking. Wetland regulations are, like zoning regulations, all but ubiquitous. At the federal level, the Clean Water Act (CWA)[6] provides for the regulation and protection of wetlands, while Michigan's wetland protection act (WPA)[7] serves the same purpose for this state. Our Legislature made clear that it enacted the WPA to benefit all the people of this state. The act provides that "[t]he legislature finds that . . . [w]etland conservation is a matter of state concern since a wetland of 1 county may be affected by acts on a river, lake, stream, or *369 wetland of other counties." M.C.L. § 324.30302(1)(a).[8]
Clearly, all people, including property owners, are the intended beneficiaries of the regulation of wetlands. Like zoning regulations, wetland regulations place a burden on some property owners, but this burden ultimately benefits all property owners, including those who claim they are unfairly burdened.
As we will discuss in detail later, we reject plaintiff's claim because (1) wetland regulations are, much like zoning regulations, comprehensive, universal, and ubiquitous, and provide an "average reciprocity of advantage" for all property owners, including plaintiffs; (2) plaintiffs have developed and retain the ability to develop a significant amount of their property, and thus plaintiffs' property retains a significant value even after the permit denial; and (3) plaintiffs are experienced commercial land developers who clearly had or were on notice of the wetland regulations promulgated under the WPA, and, therefore, plaintiffs' distinct, investment-backed expectations would reasonably have been tempered with the knowledge that their development of the property would be restricted because of the presence of wetlands.

II. FACTS AND PROCEDURAL HISTORY

A. Procedural History
This case was originally filed in the Court of Claims on December 29, 1988. Plaintiffs, K & K Construction, Inc., the J.F.K. Company, and Resorts and Company, alleged that defendant, then the Michigan Department of Natural Resources (DNR) (currently the Department of Environmental Quality),[9] had effected a regulatory taking of plaintiffs' property when it designated part of that property as wetland and denied a permit to fill in the wetland and build on the property. Following a nonjury trial, the trial court entered judgment in favor of plaintiffs. The trial court found that the DEQ's failure to issue the requested permit constituted a categorical taking of plaintiffs' property.
The DEQ appealed to this Court, which, as it turns out, erroneously affirmed the trial court's judgment. K & K Constr., Inc. v. Dep't of Natural Resources, 217 Mich.App. 56, 551 N.W.2d 413 (1996) (K & *370 K I), rev'd 456 Mich. 570, 575 N.W.2d 531 (1998). The DEQ then appealed to our Supreme Court, which reversed this Court's decision and the trial court's judgment. K & K Constr., Inc. v. Dep't of Natural Resources, 456 Mich. 570, 575 N.W.2d 531 (1998) (K & K II). Our Supreme Court held that (1) the trial court erred when it considered only the parcel of land that contained wetland (parcel one) and did not include two other contiguous parcels of land owned by plaintiffs (parcels two and four) and (2) plaintiffs were not deprived of all economic use of the land and thus there was no "categorical taking." Id. at 586, 575 N.W.2d 531. Further, our Supreme Court remanded to the trial court with instructions (1) to include the value of the two other parcels, (2) to make a finding of fact regarding whether a third parcel (parcel three) should be included in the value, and (3) to apply the balancing test articulated by the United States Supreme Court in Penn Central to determine whether plaintiffs proved their regulatory taking claim. K & K II at 588, 575 N.W.2d 531.
On remand, plaintiffs J.F.K. Company and Resorts and Company were succeeded by J.F.K. Investment Co., LLC (JFK). The parties stipulated that parcel four was not to be included in the trial court's determination, and the trial court held that parcel three would be included with parcels one and two when it determined whether a taking had occurred because of the wetland regulation. The trial court then held that under Penn Central, a taking had occurred and entered judgment in favor of plaintiffs.
The DEQ once again has appealed to this Court, and plaintiffs have cross-appealed.

B. Factual History

1. Overview
This case involves four contiguous parcels of land with a total area of approximately eighty-two acres in Waterford Township in Oakland County (parcels one through four). In 1988, a partnership was formed between J.F.K. Company and Resorts and Company, with each holding a fifty percent interest, for the purpose of developing the land in issue.[10] At some point, plaintiff J.F.K. Investment Company, LLC, replaced J.F.K. Company and Resorts and Company as a successor in interest. Plaintiff K & K Construction is a Michigan corporation in which Kosik owns fifty percent of the shares of stock.[11]
*371 Parcel one is zoned for commercial use, consists of approximately fifty-five acres, and approximately twenty-seven of those acres are wetland. Parcel two consists of sixteen acres directly south of parcel one and has a small area of wetland. Parcel three is 9.34 acres of land directly south of parcel two, with no wetland. Parcel four is 3.4 acres of land bordering the south side of parcel one and the east side of parcel two, and it has no wetland. Parcels two, three, and four are zoned for multiple-family housing. The parcels are bounded by Highland Road (M-59) on the north, North Oakland Drive on the east, Hospital Road on the west, and Pontiac Lake Road on the south.
Plaintiffs began work on a "C.J. Barrymore's Restaurant" in 1988, which was to occupy forty-two acres on parcel one and to consist of a restaurant and a sports complex, including a baseball diamond. Waterford Township issued plaintiffs a cease-and-desist letter that stated that part of parcel one contained wetland and that plaintiffs would need to get a permit from the DEQ. Plaintiffs then filed a permit application with the DEQ dated May 28, 1988, which was received by the DEQ on June 21, 1988. On June 7, 1988, plaintiffs filed an "administrative complaint" with the DEQ and sought a ruling from the department that would remove a "designation of wetland" from plaintiffs' property. Waterford Township sent a letter to plaintiffs informing them that their permit for lowland filling would be denied pending the outcome of the DEQ permit process. In November 1988, the DEQ issued a letter that denied plaintiffs' permit application.[12] Plaintiffs filed this action in December 1988.[13]
In May 1990, plaintiffs filed another application for a permit, under what is called the "Goga Plan."[14] The Goga Plan would have allowed plaintiffs to fill three acres of wetland, convert five acres of "upland" property to wetland, and develop the upland ring around the wetland. This permit application was also denied. At some point, both an office building for J.F.K. Investment Company and a Ram's Horn Restaurant were built on upland portions of parcel one.[15]
This matter was originally tried in December 1991, and the only issue before the trial court was whether the permit denials constituted a taking of plaintiffs' property. The trial court held that only parcel one *372 was relevant to its analysis of whether a taking had occurred and concluded that the permit denials had rendered the parcel, which was worth approximately $6 million before the permit denial, completely worthless after the denial. Having found a categorical taking, the trial court ordered the DEQ to compensate plaintiffs for this $6 million loss in value.
After the trial court's ruling, the DEQ opted to mitigate the loss under M.C.L. § 324.30323, which requires a trial court to give the DEQ the option, once a taking has been found, to mitigate its damages by doing one of the following: compensate the property owner for the lost value, purchase the property, or "[m]odify its action or inaction with respect to the property so as to minimize the detrimental affect [sic] to the property's value" (emphasis added).[16] The DEQ chose to reverse its previous decision and issue the Goga permit. The trial court entered judgment in favor of plaintiffs against the DEQ for a "temporary taking"[17] of the land that was subsequently allowed to be developed under the Goga Plan for the full value of the wetland on parcel one. The judgment was for approximately $450,000 plus interest for the alleged temporary taking, and approximately $3.25 million plus interest for the alleged wetland taking. At the original trial, the trial court took into account the mitigating effect of the DEQ's issuance of the Goga permit when it calculated the amount of the judgment.
The DEQ appealed the trial court's ruling to this Court. Another panel of this Court affirmed the trial court's judgment and agreed with the trial court that plaintiffs had been denied all economically beneficial use of their land, which resulted in a categorical taking. Our Supreme Court reversed, and reasoned (1) that the trial court erred in only considering parcel one and in not including parcels two and four in its valuation of plaintiffs' property,[18] and (2) in considering parcels one, two, and four, "it is clear that there was not a categorical taking. . . ."[19] The Court then remanded to the trial court, and instructed it to calculate the total value of the property using parcels one, two, and four, and to make a finding regarding whether parcel three should be considered part of the "denominator parcel." Additionally, the *373 Court held that, while the record was not clear regarding whether the trial court had failed to include the value of the two developed portions of parcel one in its valuation, there was no reason for the trial court not to do so. The Court then held that, once the trial court determined whether parcel three should also be included, and the total value including all relevant parcels (either parcels one, two, and four, or all four parcels) was calculated, the trial court was to apply the three-part balancing test from Penn Central to determine whether the DEQ's administrative decision had constituted a regulatory taking.[20] After plaintiffs' unsuccessful petition for certiorari in the United States Supreme Court, the case returned to the trial court.[21]
Unsurprisingly, during trial, plaintiffs and the DEQ offered conflicting deposition testimony relating to the value of the property. At the first trial, plaintiffs presented the testimony of Edward Cheyz, who is not a licensed real estate appraiser. He testified that parcel one was valued at approximately $5.94 million before the denial of the permit. The trial court accepted this figure while rejecting the testimony of the DEQ's appraiser. As discussed previously, the trial court found the value of these parcels to be zero after the first trial. On remand, plaintiffs offered the deposition testimony of James Mawson, a licensed appraiser, who initially testified that the pre-denial value of $5.94 million calculated by Cheyz was correct. This figure apparently represented a figure of $1.50 per square foot used by Cheyz in calculating the total value. However, on cross-examination, Mawson testified that he did not believe that Cheyz would be correct in valuing wetland at $1.50 per square foot and that a more appropriate figure might be $0.05 per square foot of wetland.
On the other hand, the DEQ offered its own expert testimony and evidence in an attempt to show that the property's "before" value had been overestimated and that its "after" value had been grossly underestimated. The DEQ also submitted evidence that, contrary to plaintiffs' arguments that the non-wetland (upland) portion of parcel one was too shallow for development, other similar "shallow" lots had been developed in the area.
Regardless, the trial court, in its opinion and order issued after the second trial, stated incorrectly that, because our Supreme Court "did not disturb" its initial valuation of parcel one, it would reaffirm that value, and the trial court again concluded that parcel one had no value after the denial of the permit. The trial court did so despite the fact that our Supreme Court held that a categorical taking[22] had not occurred. K & K II, supra at 585-587, 575 N.W.2d 531. Furthermore, the trial court reaffirmed its finding that parcel one had zero value despite the existence of the *374 Ram's Horn and the JFK office building, and despite the fact that our Supreme Court stated that it saw "no reason for [the office building and the Ram's Horn] to be excluded from the taking analysis. They were both part of parcel one . . . and neither was sold or developed before the enactment of the regulations in question." K & K II, supra at 584 n. 9, 575 N.W.2d 531. It further concluded that the value of parcels two and three, which totaled over $3 million, was not enough to offset this loss, and that the total value before the denial was just over $9 million, while the value after the denial was just over $3 million, representing a sixty-seven percent loss. The trial court then briefly addressed each of the three Penn Central factors before concluding again that the DEQ's permit denial constituted a taking. The trial court's opinion stated that it would reaffirm its previous award.
At a hearing on plaintiffs' posttrial motion for entry of judgment, the trial court found that the DEQ's issuance of the Goga Permit had not been a valid or effective way of mitigating its damages as required by M.C.L. § 324.30323 and entered judgment in September 2002 against the DEQ in the amount of $16,486,228, which included compensation for a taking of plaintiffs' property in the amount of $5.9 million, the value the trial court allocated to parcel one, together with interest, costs, and attorney fees. The judgment further imposed interest on the entire judgment, including fees and costs.
Plaintiffs moved the trial court to reconsider the judgment rate of interest. They argued[23] that the statutory rate of interest was insufficient, because plaintiffs were experienced real estate developers who could easily earn several times greater returns on their investment. The trial court rejected this argument and denied plaintiffs' motion for a greater rate of interest. Plaintiffs have filed a cross-appeal to challenge the denial of this motion.

2. Damages and the Goga Permit[24]
After the first trial, the DEQ faced a judgment in excess of $6 million for what the trial court wrongly held to be a categorical taking of plaintiffs' property. As permitted by statute, M.C.L. § 324.30323, the DEQ decided to mitigate these damages and opted to issue the Goga permit pursuant to the permit application submitted by plaintiffs. The trial court then issued a written opinion that acknowledged that the DEQ's election of this option had reduced the amount of the taking award to approximately $3.25 million.[25] The trial court additionally awarded approximately $450,000 for the temporary taking of plaintiffs' property up to the issuance of the Goga permit.
However, plaintiffs did not build on parcel one as they were entitled to do pursuant to the Goga permit.[26] Instead, plaintiffs insisted that the DEQ's appeal of the nearly $4 million judgment against it also constituted an appeal of the permit and that the DEQ intended to revoke the permit if it prevailed on appeal. The DEQ *375 sent plaintiffs a letter in which it stated that it did not believe that there should have been a judgment entered against the DEQ, and, therefore, that there should not have been damages assessed that the DEQ needed to mitigate by issuing the Goga permit. More importantly, however, the DEQ stated that the permit was valid and could be used by plaintiffs to begin development of parcel one. Yet plaintiffs continued in their assertion that the permit was subject to revocation because of the DEQ's appeal.
As stated above, after this Court heard this case, and after our Supreme Court reversed the decisions of the trial court and this Court, the case returned to the trial court after the United States Supreme Court denied a writ of certiorari. In the meantime, the Goga permit expired. After the case returned to the trial court in 1999, plaintiffs attempted to amend their complaint to raise claims in relation to the Goga permit and their claim that the permit was essentially an empty gesture. And the trial court originally, correctly, rejected plaintiffs' argument and stated that plaintiffs could not raise new claims centered on the DEQ's alleged failure to comply with the trial court's judgment. The trial court said that, instead of waiting six years to try and bring new claims, plaintiffs should have gone before the trial court to address the alleged noncompliance.
Notwithstanding plaintiffs' attempt to mischaracterize their rights and the DEQ's conduct regarding the Goga permit, the DEQ reissued the expired Goga permit for five years. Nonetheless, plaintiffs continued to insist that the Goga permit was essentially worthless because the DEQ could revoke it if it prevailed on appeal. Plaintiffs made this assertion despite yet another letter from the DEQ in which it was stated that the DEQ had no intention of revoking the permit regardless of the outcome of the case.[27] Instead of developing the land as they clearly could have under the newly reissued permit, plaintiffs continued to maintain that the Goga permit was an empty gesture. On the other hand, the DEQ maintains that plaintiffs' actions are not motivated by a fear that the Goga permit might be revoked as much as they are by a desire to continue to accrue damages related to the alleged inability to develop their land.
After the second trial, the trial court reversed its initial decision and agreed with plaintiffs regarding the Goga permit. The trial court issued a brief opinion in which it stated that it essentially was reaffirming its first judgment. After the trial court issued its opinion, plaintiffs moved for the entry of an order of judgment that included an award for the full value of parcel one. During a hearing on the motion, the DEQ reminded the trial court of the reissuance of the Goga permit and asked the trial court to take this into account, pursuant to M.C.L. § 324.30323, when it entered judgment, as the court had done after the first trial. However, this time, the trial court erroneously refused to take the Goga permit into account. Indeed, during the hearing, the trial court stated, in response to the DEQ's request, that it "[found] the state's handling of the Goga permit personally offensive."
Ultimately, the trial court entered judgment in the amount of the entire value of parcel one, approximately $5.94 million, plus interest, costs, and attorney fees, *376 which resulted in a total judgment in excess of $16 million, with additional interest payable from the date of judgment at the statutory rate. On appeal, plaintiffs continue to assert that the Goga permit's issuance by the DEQ was a hollow gesture that did not, in reality, mitigate any damages, while the DEQ insists that plaintiffs' claims that the permit is ineffective constitute a pretense for an attempt to accrue further damages.

III. STANDARDS OF REVIEW
We review a trial court's findings of fact for a clear error and disturb the trial court's findings only where we are "left with the definite and firm conviction that a mistake has been made." Essexville v. Carrollton Concrete Mix, Inc., 259 Mich. App. 257, 265, 673 N.W.2d 815 (2003).[28]
Whether the government has effected a taking of one's property is a constitutional issue, U.S. Const., Am. V; Const. 1963, art. 10, § 2, which we review de novo. People v. Cain, 238 Mich.App. 95, 111, 605 N.W.2d 28 (1999).

IV. ANALYSIS

A. Trial Court's Compliance with the Supreme Court's Remand Order
The DEQ correctly asserts that the trial court disregarded the specific remand instructions of our Supreme Court. "`The power of the lower court on remand is to take such action as law and justice may require so long as it is not inconsistent with the judgment of the appellate court.'" People v. Fisher, 449 Mich. 441, 446-447, 537 N.W.2d 577 (1995) (citations omitted); Waatti & Sons Electric Co. v. Dehko, 249 Mich.App. 641, 646, 644 N.W.2d 383 (2002). When an appellate court remands a case without instructions, a lower court has the "same power as if it made the ruling itself." Fisher, supra at 447, 537 N.W.2d 577. However, when an appellate court gives clear instructions in its remand order, it is improper for a lower court to exceed the scope of the order. Waatti & Sons, supra at 646, 644 N.W.2d 383. "It is the duty of the lower court or tribunal, on remand, to comply strictly with the mandate of the appellate court." Rodriguez v. Gen. Motors Corp. (On Remand), 204 Mich.App. 509, 514, 516 N.W.2d 105 (1994).

1. The Trial Court's Findings of Fact on Remand Regarding the Value of the Denominator Parcel
During the first trial, the trial court considered only the value of parcel one in making its decision whether the DEQ's denial of a wetland permit constituted a taking. The trial court held that the DEQ's action deprived parcel one of all its economic value and that the DEQ had taken plaintiffs' property. Our Supreme Court, however, held, consistently with Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), that a categorical taking had not occurred. K & K II, supra at 585-587, 575 N.W.2d 531. The Court then remanded the case to the trial court and clearly directed the trial court to make a new finding of fact with respect to the value of *377 plaintiffs' property and to include parcel two with parcel one when doing so. Furthermore, the trial court was clearly directed to make a finding of fact regarding whether parcel three should also be included in its analysis. Id. at 588, 575 N.W.2d 531. After the trial court made these new findings of fact, the trial court was to apply the three Penn Central factors, as mandated by our Supreme Court, to determine whether the DEQ's action here constituted a taking.
Unfortunately, on remand, the trial court failed to adhere to the Supreme Court's mandates. The trial court did make a finding of fact that parcel three should be included in its analysis during the new trial. Furthermore, the trial court purportedly considered parcels one, two, and three together in its analysis, as our Supreme Court's decision required. However, the court rationalized its ruling by contending that our Supreme Court had not specifically disturbed its valuation of plaintiffs' property before and after the permit denial, simply reaffirmed its finding that the value of parcel one had diminished from nearly $6 million to zero. The court did this despite the fact that our Supreme Court essentially foreclosed any possibility of a finding that parcel one had a value of zero:
Even if we did limit our analysis to parcel one, the Court of Appeals conclusion that a categorical taking had occurred is not supported by the record. In its first opinion, the trial court stated: "While it is true that some financial value will remain, this Court finds that what little economic value remains is but a small fraction of the economic value the property would have had if all of it could be developed." (Emphasis added.) Thus, while the regulations may have diminished the value of plaintiffs' land, this diminution in value would not give rise to a categorical taking. . . . [K & K II, supra at 587 n. 13, 575 N.W.2d 531 (emphasis in the original).]
After a careful review of the trial proceedings, it is clear that the trial court failed to include the values of a Ram's Horn Restaurant and plaintiff JFK's office building, both located on upland portions of parcel one. Our Supreme Court stated that it saw "no reason for [the office building and the restaurant] to be excluded from the taking analysis. They were both part of parcel one as originally purchased, and neither was sold or developed before the enactment of the regulations in question." Id. at 584 n. 9, 575 N.W.2d 531. The evidence presented during the trial after remand shows that the Ram's Horn and the JFK office building have a combined value of at least $1 million. Furthermore, our Supreme Court explicitly stated that "plaintiffs were not prohibited from developing the remaining upland on parcel one. . . ." K & K II, supra at 587, 575 N.W.2d 531. Were the trial court to have complied with our Supreme Court's remand instructions, the trial court could not reasonably have reaffirmed its previous finding that the value of parcel one had been reduced to zero. For this reason alone, the trial court's holding must be reversed.
Additionally, the trial court then found that parcels two and three had a value approximately $3 million. The trial court reasoned that this value was not high enough to "offset" the diminution in value that the court ruled parcel one had sustained. While the trial court held that the value of the entire "denominator parcel," consisting of parcels one, two, and three, had been diminished in value by sixty-seven percent, from approximately $9 million to just over $3 million, the trial court's analysis here centered on the value of parcel one. Rather than treating the three parcels as a single denominator parcel *378 as our Supreme Court mandated, the trial court erroneously continued to treat parcel one as the relevant parcel, and only considered the values of parcels two and three to the extent that they might "offset" the diminution in the value of parcel one. This directly contradicts our Supreme Court's holding that any taking analysis here must look beyond the value of parcel one, and include the value of the entire denominator parcel. Accordingly, we conclude that the trial court did not comply with our Supreme Court's remand instructions with respect to determining the value of the denominator parcel. Because we so conclude, we hold that the trial court's findings of fact with respect to the value of the denominator parcel are clearly erroneous, and its decision is reversed.

2. Compliance with the Supreme Court's Order to Apply the Facts to Penn Central

The trial court's Penn Central analysis also failed to comply with the Supreme Court's remand instructions.[29] A trial court must "comply strictly" with our Supreme Court's mandate. Rodriguez, supra at 514, 516 N.W.2d 105. Here, the trial court, without an explanation of what the factors mean, and, indeed, without so much as a citation of Penn Central, devoted not much more than a page of its analysis to this difficult, crucial, and dispositive analysis that was clearly mandated by our Supreme Court's remand order. Moreover, and dispositively, the trial court's ruling simply failed to properly apply the law to the facts.
For these reasons and reasons we will discuss in greater detail below, we hold that the trial court did not comply with our Supreme Court's remand instructions with respect to its purported Penn Central analysis.

3. The Goga Permit and Mitigation
As outlined above, our Legislature, following the lead of the United States Congress, passed comprehensive legislation to protect Michigan's wetlands for the benefit of its citizens. This represents a clear public policy determination and statement of the importance to the citizens of this *379 state, including property owners, of preserving wetlands for public welfare. M.C.L. § 324.30302. Moreover, the Michigan Constitution provides that "[t]he legislature shall provide for the protection of the air, water and other natural resources of this state. . . ." Const. 1963, art. 4, § 52. In keeping with this mandate, the Legislature enacted the Natural Resources and Environmental Protection Act (NREPA), M.C.L. § 324.101 et seq., which contains the WPA. The Legislature vests the DEQ with the responsibility for guarding our state's valuable natural resources on behalf of the citizens of this state. M.C.L. § 324.501.
In keeping with this constitutional and statutory scheme, our Legislature also expressed its intent that the DEQ should act to preserve public funds as well as public resources by establishing a statutory framework to mitigate damages to the state should a court find that the DEQ "went too far" in implementing the wetland regulations in a particular case. M.C.L. § 324.30323(3) represents our Legislature's well-considered plan to serve the dual purpose of having the DEQ protect the environment while also protecting the pocketbooks of our citizens by creating a mechanism to mitigate damages in those cases where courts find that the DEQ may have gone too far. Here, the DEQ, as our Legislature envisioned, acted properly under the statute to mitigate damages. The trial court should not have disregarded this legislative mandate where the DEQ, acting to preserve the citizens' financial resources, agreed to an alternative use of the land, as proposed by plaintiffs, that would have allowed substantial development of the property at issue.
The courts of this state must recognize that our constitutionally and statutorily mandated agencies, like the DEQ, have a difficult duty in administering complex laws to preserve the environment for all citizens while respecting the important private property rights of those directly affected by the regulations. Our Legislature clearly saw the wisdom of anticipating that, in balancing these competing, important interests, the DEQ might err, at least in the judgment of a judge who is asked to review a specific application of the wetland regulations to a specific piece of property. And, when a judge rules against the DEQ, the state agency has the further task of again deciding how best to preserve taxpayer dollars and the environment by choosing the legislative options of purchasing the property, paying the amount of the lost economic value, or taking some other action, such as the issuance of an alternative permit that allows greater development, but with minimal damage to wetlands. Our courts should not ignore this complex, important statutory mitigation scheme. This legislative mandate is an important application of constitutional, statutory, and administrative law that must be respected and administered by our courts in the best interests of the public. This, the trial court simply failed to do. The statute does not allow a trial court to deny the state a chance to mitigate a regulatory taking judgment on the basis of the trial court's views of the DEQ.
Moreover, we agree with the trial court's original ruling with respect to the Goga permit, and further hold that plaintiffs waived this claim that the DEQ's appeal rendered the Goga permit invalid. If plaintiffs truly believed that the DEQ disobeyed that portion of the trial court's original order regarding the Goga permit, then plaintiffs should have sought the appropriate relief. Our review of the record reveals no attempt by plaintiffs to seek declaratory or other relief with respect to the Goga permit. Any claim that the DEQ's appeal rendered the Goga permit invalid here was waived by plaintiffs' own *380 conduct.[30]Lewis v. LeGrow, 258 Mich. App. 175, 210, 670 N.W.2d 675 (2003) ("[E]rror requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence.").

B. The Penn Central Factors as Applied to This Case
In Penn Central, the United States Supreme Court noted that "[t]he question of what constitutes a `taking' . . . has proved to be a problem of considerable difficulty." Penn Central, supra at 123, 98 S.Ct. 2646. The constitutional requirement that the state provide just compensation for the taking of one's property is "`designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Id. at 123-124, 98 S.Ct. 2646, quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). The Court stated that taking determinations are "essentially ad hoc, factual inquiries. . . ." Penn Central, supra at 124, 98 S.Ct. 2646.
Since the United States Supreme Court's decision in Penn Central, and, indeed, since our Supreme Court's decision in K & K II, the United States Supreme Court has further explained its holding in Penn Central. A governmental regulation that deprives a landowner of "all economically beneficial use" of his or her property, is a categorical taking that requires compensation. Palazzolo v. Rhode Island, 533 U.S. 606, 615-616, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), citing Lucas, supra. Here, our Supreme Court rejected the trial court's ruling that the DEQ had effected a categorical taking of plaintiffs' property and remanded the case to the trial court with the instruction to determine, pursuant to Penn Central, whether a taking had occurred despite the fact that plaintiffs' property had some, but because of the trial court's error, a yet to be determined, remaining value. The United States Supreme Court in Penn Central identified three factors to be examined when a court makes such a determination:
[1] The economic impact of the regulation on the claimant and, particularly, [2] the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is [3] the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good. [Penn Central, supra at 124, 98 S.Ct. 2646 (citations omitted).]
As we will discuss in greater detail below, while no one of the three factors is dispositive in and of itself, a key factor in terms of wetland regulations is the third, the character of the government action. Where, as here, the regulation serves an important public interest and is widespread and ubiquitous, we conclude that, to sustain a regulatory taking claim, a plaintiff must prove that the economic impact and the extent to which the regulation has interfered with distinct investment-backed expectations are the functional equivalent of a physical invasion by the government of the property in question.

1. Economic Impact of the Regulation
A reduction in the value of the regulated property is insufficient, standing *381 alone, to establish a compensable regulatory taking. Penn Central, supra at 131, 98 S.Ct. 2646. Indeed, the Supreme Court in Penn Central cited two of its previous opinions in which the Court refused to hold that there was a regulatory taking: Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), in which a zoning regulation resulted in a seventy-five percent diminution in value, and Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), in which the regulation resulted in an 87.5 percent diminution.
Here, the DEQ's initial refusal to grant the requested permit unquestionably caused some decrease in the value of the property. After the second trial, the trial court held, erroneously, that the value had declined from a value before the denial of the permit of approximately $8.94 million to a value after denial of approximately $3 million, which represents a diminution of value of approximately sixty-seven percent. Even under this incorrect, inflated "damage calculation," plaintiffs failed to demonstrate a sufficient decrease in value to constitute a compensable regulatory taking under Penn Central; Euclid, and Hadacheck.[31]
However, as we discussed above, the trial court not only failed to account for the substantial value of the land that could have been developed pursuant to the Goga permit, worth at least $2.8 million, as it had after the first trial, but it also did not include the approximate $1 million value of the Ram's Horn and JFK office building. Accordingly, the proper value after denial for the denominator parcel would be approximately $5.8 to $6.8 million, which represents a decrease in value of approximately twenty-four to thirty-three percent. While this diminution of value is significant, we conclude that this figure most certainly does not weigh in favor of a finding that the DEQ's actions constitute a compensable regulatory taking.[32]
Moreover, as we discussed above, plaintiffs could have developed the land pursuant to the Goga permit, and could possibly have increased the value of the land, or, at the very least further mitigated any loss in value but for their unjustifiable inaction.

2. Plaintiffs' Distinct Investment-Backed Expectations
A court must also examine the extent to which the regulation has interfered with the property owner's "reasonable investment-backed expectations." Palazzolo, supra at 618, 121 S.Ct. 2448, citing Penn Central, supra at 124, 98 S.Ct. 2646. A key factor is notice of the applicable regulatory regime, here wetland regulations. The Supreme Court in Palazzolo rejected the principle that the purchase of property after the enactment of a wetland regulation absolutely bars a taking claim. Palazzolo, supra at 626-630, 121 S.Ct. 2448.[33] However, notice of such regulations *382 should nevertheless be taken into account.[34] In her separate concurrence in Palazzolo, Justice O'Connor explained the importance of notice:
As the Court holds, the Rhode Island Supreme Court erred in effectively adopting the sweeping rule that the pre-acquisition enactment of the use restriction ipso facto defeats any takings claim based on that use restriction. . . .
The more difficult question is what role the temporal relationship between regulatory enactment and title acquisition plays in a proper Penn Central analysis. Today's holding does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the Penn Central analysis. Indeed, it would be just as much error to expunge this consideration from the takings inquiry as it would be to accord it exclusive significance. Our polestar instead remains the principles set forth in Penn Central itself and our other cases that govern partial regulatory takings. Under these cases, interference with investment-backed expectations is one of a number of factors that a court must examine. Further, the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations. [Palazzolo, supra at 632-633, 121 S.Ct. 2448 (O'Connor, J., concurring) (emphasis added).]
In other words, equity is no better served by ignoring a claimant's knowledge of existing land-use regulations than it would be by holding that the claimant's knowledge of those regulations absolutely barred recovery regardless of how inequitable those regulations might be.
[I]f existing regulations do nothing to inform the analysis, then some property owners may reap windfalls and an important indicium of fairness is lost. As I understand it, our decision today does not remove the regulatory backdrop against which an owner takes title to property from the purview of the Penn Central inquiry. It simply restores balance to that inquiry. [Id. at 635, 121 S.Ct. 2448.]
The WPA was originally enacted as the Goemaere-Anderson Wetland Protection Act in 1979.[35] Here, plaintiffs acquired title to the property in 1986. And, as plaintiffs themselves point out, JFK and Kosik are experienced commercial land developers with extensive knowledge of land-use regulations.[36] This knowledge and experience logically must be taken into account when determining what plaintiffs' reasonable, investment-backed expectations were with respect to the denominator parcel and in determining the extent of the WPA's effect on those expectations. Despite this admitted extensive commercial land development and legal expertise, plaintiffs nonetheless claim that they were unable to discover a twenty-seven-acre area of wetlands.[37] Given the significant *383 area of wetland on the denominator parcel and plaintiffs' experience in commercial land development, together with their notice of wetland regulations, we conclude that a reasonable person with the extensive expertise that plaintiffs possess would have notice of the existence of both the wetlands and the WPA.
As Palazzolo teaches us, the mere fact that plaintiffs had notice of the WPA does not end the inquiry with respect to their reasonable, investment-backed expectations and the effect of the governmental regulation challenged here. However, as Justice O'Connor explained, plaintiffs' notice of the WPA does help shape the analysis of whether plaintiffs' expectations were reasonable. Plaintiffs' alleged actual expectations involved building a forty-two-acre restaurant/sports complex on parcel one. However, with their experience, notice of the WPA, and the fact that twenty-seven acres of wetland existed on parcel one, this expectation was not reasonable. Looking at the denominator parcel as a whole, a reasonable expectation would be that plaintiffs would be able to develop the upland areas of the denominator parcel that are not wetlands. Indeed, there has been significant development on parcels two and three. On parcel one, there has been some development on the upland, including the construction of an office building and a restaurant. And the Goga permit allows plaintiffs to utilize the remaining upland, as well as some of the wetland acreage (contingent upon the conversion of other, non-wetland acreage to wetland). The fact that plaintiffs have chosen not to make use of the Goga permit is wholly irrelevant to our analysis. However, when we consider the actual development of the entire denominator parcel, together with the development potential afforded plaintiffs by the Goga permit, it is clear that there has not been a significant negative effect on plaintiffs' reasonable investment-backed expectations.
Plaintiffs acquired the denominator parcel for the purpose of commercial development. On this parcel, they have constructed apartment homes, a restaurant, and an office building, with a total value of at least $5.8 million. Furthermore, the record shows that, while a significant portion of the parcel consists of wetland, there is nevertheless a significant area of upland that may be commercially developed. Plaintiffs claim, but failed to prove, that the DEQ's refusal to allow plaintiffs to fill in the entire wetland portion of the denominator parcel has thwarted their reasonable, investment-backed expectations. This simply is not supported by the evidence.
Accordingly, we hold that the effect of the governmental regulation on plaintiffs' reasonable, investment-backed expectations weighs against a conclusion that a taking has occurred.

3. Character of the Government Action
This factor requires a court to place the challenged regulatory action along a spectrum ranging from an actually physical taking on one extreme, to a far-reaching, ubiquitous governmental regulation that provides all property owners with an "average reciprocity of advantage" on the other. As the United States Supreme Court explained, "A `taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public *384 program adjusting the benefits and burdens of economic life to promote the common good." Penn Central, supra at 124, 98 S.Ct. 2646. Clearly, this case does not involve a physical taking. The relevant inquiries are whether the governmental regulation singles plaintiffs out to bear the burden for the public good and whether the regulatory act being challenged here is a comprehensive, broadly based regulatory scheme that burdens and benefits all citizens relatively equally. See Walcek v. United States, 49 Fed.Cl. 248, 270 (2001); R & Y, Inc. v. Anchorage, 34 P.3d 289, 298 (Alaska, 2001).[38] In Penn Central, the Supreme Court rejected the plaintiffs' argument that the New York City law that designated certain property as historic, and thus restricted the use and development of that property, served to single out the plaintiffs to carry the burdens of the regulation:
[A]ppellants' repeated suggestions that they are solely burdened and unbenefited is factually inaccurate. This contention overlooks the fact that the New York City law applies to vast numbers of structures in the city in addition to the Terminal  all the structures contained in the 31 historic districts and over 400 individual landmarks, many of which are close to the Terminal. Unless we are to reject the judgment of the New York City Council that the preservation of landmarks benefits all New York citizens and all structures, both economically and by improving the quality of life in the city as a whole  which we are unwilling to do  we cannot conclude that the owners of the Terminal have in no sense been benefited by the Landmarks Law. [Penn Central, supra at 134-135, 98 S.Ct. 2646.]
Indeed, even the dissent in Penn Central noted in language equally applicable to this state's wetland regulations, that regulation in and of itself does not constitute a taking if it applies to a widespread group of landowners:
[A] taking does not take place if the prohibition applies over a broad cross section of land and thereby "secure[s] an average reciprocity of advantage." It is for this reason that zoning does not constitute a "taking." While zoning at times reduces individual property values, the burden is shared relatively evenly and it is reasonable to conclude that on the whole an individual who is harmed by one aspect of the zoning will be benefited by another.
. . . For the reasons noted in the text, historic zoning, as has been undertaken by cities such as New Orleans, may well not require compensation under the Fifth Amendment. [Id., supra at 147, 98 S.Ct. 2646 (Rehnquist, J., dissenting) (citations deleted; emphasis in the original).]
Michigan's wetland regulations, like zoning regulations, are comprehensive and universal throughout this state. The federal government enacted the CWA, which permits the regulation of wetlands, and our Legislature enacted the WPA to protect wetlands in this state.[39] Our Legislature *385 made clear, within the very text of the WPA, that the regulation and protection of Michigan's wetlands is intended to benefit the people of this state in a variety of ways. All property owners in this state share these benefits relatively equally, and all property owners and, all prospective owners are relatively equally subject to the burdens placed on much of the property in this state by the wetland regulations.
Applying a similar analysis, the Alaska Supreme Court held that the regulatory action being challenged in R & Y, Inc. was a "wetlands preservation scheme which applies broadly to all landowners and which benefits both the public generally and the landowners in particular." R & Y, Inc., supra at 298. The court then noted that, as in this state, "[s]cientists and legislators have recognized the unique ecological and economic value that wetlands provide in protecting water quality, regulating local hydrology, preventing flooding, and preventing erosion." Id.[40]
The United States Court of Claims has similarly stated that "Congress attempted to protect wetlands while dealing with the concerns of private individuals." Brace v. United States, 48 Fed Cl 272, 279 (2000). The court also explained that "the existence of the wetland regulations in question. . . indisputably serve an important public purpose  one which benefits plaintiffs as members of the public at large." Walcek, supra at 270.
Similarly, plaintiffs here cannot establish that the WPA's enforcement has the effect of singling out plaintiffs to bear the burden of a public benefit. What the federal Court of Claims said about federal wetland regulations is equally applicable to Michigan: "the [CWA] and the wetlands regulations issued thereunder are generally applicable to all similarly situated property owners and can in no way be viewed as being directed at plaintiffs." Walcek, supra at 270.
Again, the Alaska Supreme Court's reasoning in rejecting the plaintiff's taking claim in R & Y, Inc., applies here:
[T]he landowners were not singled out and made to suffer unduly burdensome economic loss. Instead, they incurred only relatively minor economic loss due to generally applicable wetlands restrictions which govern all land use . . . and benefit all landowners, including these landowners, by preserving the ecologically and economically valuable functions of wetlands. [R & Y, Inc., supra at 300.][[41]]
Here, plaintiffs are simply not being singled out by the WPA. The WPA provides a regulatory framework that applies to all property owners in this state for the benefit of all landowners. Indeed, were we to *386 uphold the trial court's award, we would, in effect, single out plaintiffs to their benefit, because compensating plaintiffs for the loss of value of their property, especially when it has a significant amount of value and development potential remaining, would be tantamount to making the plaintiffs exempt from the regulation of wetlands, to the detriment of others who bear the burden of wetland regulations throughout the state.
Accordingly, we conclude that the character of the government action was a wide-reaching, regulatory action that seeks to protect the rights of the public and to provide an "average reciprocity of advantage," and that this factor weighs heavily against finding that a compensable regulatory taking has occurred here.[42]

V. CONCLUSION
Because the challenged land-use regulation here, like traditional zoning, is comprehensive and universal so that plaintiffs are relatively equally benefited and burdened by the challenged regulation as other similarly situated property owners, because plaintiffs purchased the land with knowledge of the regulatory scheme, and because plaintiffs have made and can make valuable use of their land despite the application of this regulation, we conclude that compensation is not required under Penn Central.
Therefore, we hold that plaintiffs have failed to establish that the DEQ's regulatory action here constituted a compensable regulatory taking of their property. Consequently, we reverse the trial court's judgment in favor of plaintiffs and enter judgment in favor of the DEQ. See MCR 7.216(A)(7).

*387 APPENDIX

 Summary of the Trial Court's Damage Awards
 Before Permit After Before Permit After Permit Credit for Award to
 Denial Value, Permit Denial Value, Denial Value, Goga Permit Plaintiffs
 Parcel 1 Denial Denominator Denominator
 Value, Parcel Parcel
 Parcel 1
Trial 1 Approximately $0 Approximately $0 Approximately Approximately
 $5.94 million $5.94 million $2.8 million $3.25 million
 (Parcel 1 only) (For taking of
 wetland) plus
 approximately
 $450,000
 (temporary
 taking of
 entire parcel)
Trial 2 Approximately $0 Approximately Approximately $0 Approximately
(after $5.94 million $9 million $3 million $5.94 million
remand (Parcels 1, 2, (plus over $10
from our and 3, pursuant million for
Supreme to the Michigan interest, costs,
Court) Supreme and attorney
 Court's remand fees)
 order)

NOTES
[1] U.S. Const., Am. V; see also Const. 1963, art. 10, § 2.
[2] As the United States Supreme Court explained:

The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use. Our cases establish that even a minimal "permanent physical occupation of real property" requires compensation under the Clause. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Court recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs. In Justice Holmes' well-known, if less than self-defining, formulation, "while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." Id. at 415, 43 S.Ct. 158. [Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).]
[3] Land-use regulations, such as zoning, are necessary to protect private property rights and values. Zoning regulations can be used to prevent, for example, a mining operation or a factory from being built within a residential neighborhood. See, e.g., Euclid v. Ambler Realty Co., 272 U.S. 365, 385-389, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Such a zoning regulation creates what Justice Holmes termed "an average reciprocity of advantage," Mahon, supra at 415, 43 S.Ct. 158, which both burdens and benefits landowners relatively equally. Such regulations are not considered takings, and thus do not require compensation, in part because, as Justice Holmes stated, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Id. at 413, 43 S.Ct. 158. On the other hand, "if regulation goes too far it will be recognized as a taking." Id. at 415, 43 S.Ct. 158. When the effect of a regulation goes as far as to deprive a property owner of all economically beneficial value of his or her land, it results in a "categorical taking." See, e.g., Palazzolo, supra at 615-616, 121 S.Ct. 2448, citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); see also Mahon, supra at 413-416, 43 S.Ct. 158 (regulation forbade coal mining on land for which the plaintiff was the holder of mineral rights, thus destroying the plaintiff's entire interest in the land); see also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 324, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("Land-use regulations are ubiquitous and most of them impact property values in some tangential way  often in completely unanticipated ways. Treating them all as per se takings could transform government regulation into a luxury few governments could afford.").
[4] See K & K Constr., Inc. v. Dep't of Natural Resources, 456 Mich. 570, 587-588, 575 N.W.2d 531 (1998). Indeed, as we will discuss further below, our Supreme Court so instructed the trial court. However, the trial court, while acknowledging the Penn Central test and our Supreme Court's mandate, failed to actually apply the Penn Central factors during the trial after remand.
[5] See, e.g., Tahoe-Sierra, supra; Palazzolo, supra; Lucas, supra.
[6] 33 U.S.C. § 1251, et seq.
[7] M.C.L. § 324.30301 et seq.
[8] The statute provides that the Legislature further found that:

(b) A loss of a wetland may deprive the people of the state of some or all of the following benefits to be derived from the wetland:
(i) Flood and storm control by the hydrologic absorption and storage capacity of the wetland.
(ii) Wildlife habitat by providing breeding, nesting, and feeding grounds and cover for many forms of wildlife, waterfowl, including migratory waterfowl, and rare, threatened, or endangered wildlife species.
(iii) Protection of subsurface water resources and provision of valuable watersheds and recharging ground water supplies.
(iv) Pollution treatment by serving as a biological and chemical oxidation basin.
(v) Erosion control by serving as a sedimentation area and filtering basin, absorbing silt and organic matter.
(vi) Sources of nutrients in water food cycles and nursery grounds and sanctuaries for fish.
(c) Wetlands are valuable as an agricultural resource for the production of food and fiber, including certain crops which may only be grown on sites developed from wetland. [M.C.L. § 324.30302(1)(b)-(1)(c).]
[9] For the sake of consistency, though the Department of Environmental Quality was known as the Department of Natural Resources at the outset of this case, we will refer to defendant as "DEQ" throughout our opinion.
[10] Joseph Kosik, Sr. (Kosik), and his wife Elaine acquired the land, which was originally farmland, in 1976. A series of often confusing real estate transactions ensued, as well as reorganizations of various business entities. The Kosiks quitclaimed the land in 1977 to Kosik and Leon Blachura as individual guarantors, and to Waterford Mall, a partnership consisting of the J.F.K. Company, a Michigan limited partnership consisting of their five sons; Alpine Valley Ski Area, Inc., a Michigan corporation; Alpine Valley Resort, Inc., a Wisconsin corporation; and the North Oakland Development Corporation. In 1983, Kosik; Alpine Valley Ski Area, Inc.; and Alpine Valley Resorts, Inc., conveyed their interests in the land to J.F.K. Company. In the meantime, litigation, through which the Kosiks and J.F.K. Company sought to quiet title to the land in their favor because of the North Oakland Development Corporation's default on its obligations, was resolved in 1986 with a circuit court warranty deed conveying the entire interest in the land to the Kosiks and J.F.K. Company. Because of the Kosiks' and Alpine Valley's conveyances, J.F.K. Investment Company ultimately held title to the land.
[11] While K & K Construction, Inc., does not own any interest in the land, it was under contract to develop a part of it. It appears that to date there is no dispute with respect to whether K & K is a proper party to this case. Yet, both K & K I, and K & K II, acknowledge that K & K Construction has no ownership interest in the land, and for reasons that remain unclear, K & K was permitted to continue as a party to this suit.
[12] The letter stated, among other things, that the proposed development was "not wetland dependent," that plaintiffs had "alternatives available in the avoidance of the wetland," and that there had been no public need for the development demonstrated. The letter went on to note that DEQ representatives saw "drainage ditches present[,] which cut through the wetland area, as well as large amounts of sand fill deposited over much of the site," and ordered plaintiffs to cease and desist from any further excavation of ditches and placement of sand fill in the wetland area.
[13] Though we need not comment on plaintiffs' failure to seek administrative relief, we note that the Legislature provided for an extensive administrative appeal process and for judicial review of the administrative appeal. See M.C.L. § 324.30307.
[14] This alternative plan for development was apparently named for an engineer who devised the plan for plaintiffs. We will hereafter refer to this permit as the "Goga permit."
[15] Though pursuant to our Supreme Court's holding in K & K II, we are to consider the entire denominator parcel, which consists of parcels one, two, and three, we find it necessary at times to refer to the constituent parcels individually. Nevertheless, our ultimate analysis under Penn Central is applied, as our Supreme Court has mandated, to the denominator parcel as a whole.
[16] M.C.L. § 324.30323(3) provides:

If the court determines that an action of the department or a local unit of government pursuant to this part or an ordinance authorized pursuant to section 30307(4) constitutes a taking of the property of a person, then the court shall order the department or the local unit of government, at the department's or the local unit of government's option, as applicable, to do 1 or more of the following:
(a) Compensate the property owner for the full amount of the lost value.
(b) Purchase the property in the public interest as determined before its value was affected by this part or the local ordinance authorized under section 30307(4) or the action or inaction of the department pursuant to this part or the local unit of government pursuant to its ordinance.
(c) Modify its action or inaction with respect to the property so as to minimize the detrimental affect [sic] to the property's value.
[17] We note that the United States Supreme Court rejected a "temporary taking" claim in Tahoe-Sierra, supra at 330-335, 122 S.Ct. 1465. The Court reasoned that requiring a governmental agency to compensate a property owner for the loss of value while considering applications for permits and variances under a land-use regulatory scheme would either become cost-prohibitive or lead to governmental agencies making hasty, presumably haphazard, decisions. Id. at 334-335, 122 S.Ct. 1465.
[18] K & K II, supra at 578-582, 575 N.W.2d 531.
[19] Id. at 586, 575 N.W.2d 531.
[20] After remand, at the second trial, the parties stipulated that parcel four would not be considered in the trial court's determination of the value of plaintiffs' property, because that parcel was purchased after the denial of the permits.
[21] Plaintiffs assert that throughout the pendency of this litigation, their attempts to develop or sell parcel one have been thwarted by the DEQ's appeal of this case. Of course the DEQ has the absolute right to appeal and, indeed, the duty to appeal an erroneous damage award because the DEQ is the appropriate state agency to protect both public funds and wetlands. Plaintiffs had the right to pursue development under the Goga permit that plaintiffs themselves proposed.
[22] As we will discuss in greater detail later, when a governmental regulation deprives a landowner of "`all economically beneficial use'" of his or her property, a categorical taking occurs, which requires compensation. Palazzolo, supra at 615-616, 121 S.Ct. 2448, quoting Lucas, supra.
[23] Interestingly, plaintiffs raised this argument for the first time on remand.
[24] The appendix to our opinion is a chart that summarizes the trial court's award of damages after both trials.
[25] This amount reflects the trial court's calculation of the value of the percentage of parcel one that constituted wetland based upon its valuation of the entire parcel at approximately $5.94 million, plus interest up to the time of the judgment.
[26] The Ram's Horn restaurant and the JFK office building were constructed on the non-wetland (upland) portion of parcel one; plaintiffs did not require the Goga permit to build these structures.
[27] This letter stated, in relevant part, "As I have repeatedly expressed, it is not now and never was the intention of [the DEQ] to seek to revoke or otherwise limit the "Goga Plan" permit through appeal."
[28] The DEQ urges us to set aside the clearly erroneous standard in favor of a review de novo. The DEQ argues that the trial court's findings are not entitled to deference because the trial court conducted the trial solely on the submission of de benne esse depositions, exhibits, and oral argument. However, the DEQ stipulated the entry of an order that specified exactly that procedure for trial. The DEQ cannot claim an error to which it contributed. Farm Credit Services of Michigan's Heartland, PCA v. Weldon, 232 Mich.App. 662, 683-684, 591 N.W.2d 438 (1998). Accordingly, we will not set aside the clearly erroneous standard here.
[29] The trial court's conclusions regarding the three factors read, in its entirety:

1. What is the Character of the Government Action in this Case?
In this case, the government activity, as noted, has taken the entire value of parcel one with the exception of two small areas that were developed prior to the wetland determination in this case. Thus the declaration of a wetland has taken, for all intents, the entire value of the parcel as previously found.
2. The Economic Effect of the Regulations.
This Court finds that the regulations in this case have deprived the Plaintiffs of the entire economic value of parcel one which is approximately two-thirds of the value of the entire denominator parcel.
3. The Interference with Investment-Backed Expectations.
Clearly, Plaintiffs intended to develop parcel one for economic gain. There is no question from the facts of this case that Plaintiffs have always intended to develop parcel one. They applied for zoning and dutifully paid commercial taxes on this parcel for many years. In addition, this property is not a characteristic wetland where an owner would likely be on notice of potential difficulties with development. The record showed an investment of several millions of dollars and the loss of a huge commercial development on parcel one. Applying the law to these facts demonstrates that the loss of parcel one far overshadows parcels two and three in area and in value.
This Court finds that applying the test as required to the entire parcel under consideration shows a taking. This Court reaffirms its award as previously entered for Plaintiff [sic] together with costs and attorney fees. Interest shall run in the proscribed [sic] manner from the date of taking.
[30] We hold only that plaintiffs have waived any claim that the DEQ's appeal rendered the Goga permit invalid. Nothing in our holding prevents plaintiffs from pursuing their right to seek issuance of a Goga-type permit in the future.
[31] Indeed, in Lucas, the Court noted that it is quite possible for a landowner to suffer a ninety-five percent diminution in value as the result of a regulatory action and nevertheless be unable to establish a regulatory taking. Lucas, supra at 1019 n. 8, 112 S.Ct. 2886.
[32] This conclusion is supported by the fact that far greater diminutions of value have been found not to give rise to taking claims. See Euclid, supra, and Hadacheck, supra; see also William C. Haas & Co., Inc. v. City & Co. of San Francisco, 605 F.2d 1117, 1120 (C.A.9, 1979) (ninety-five percent diminution in value). Moreover, the Supreme Court has held time and again that even a significant diminution in value is not enough on its own to establish a regulatory taking. See Penn Central, supra at 131, 98 S.Ct. 2646; Concrete Pipe and Products of California, Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).
[33] Indeed, the Court stated, "A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." Id. at 628, 113 S.Ct. 2264.
[34] See Cordes, The Effect of Palazzolo v. Rhode Island on Takings and Environmental Land Use Regulation, 43 Santa Clara L. R. 337, 376 (2003), citing the concurring opinion of Justice O'Connor in Palazzolo, supra at 635, 121 S.Ct. 2448; Justice Stevens, dissenting in part and concurring in part, id. at 637-645, 121 S.Ct. 2448; and Justice Ginsburg's dissent, id. at 645 n. 3, 121 S.Ct. 2448.
[35] The WPA was later reenacted as Part 303 of the Natural Resources and Environmental Protection Act of 1994.
[36] Indeed, Kosik is a lawyer by training.
[37] Plaintiffs claim that the wetland was "not characteristic" because it was sandy; however, there is evidence, in the form of the DEQ's initial permit denial letter, that the wetland consisted of sand because "someone" had filled it in with sand. We also note that plaintiffs had begun attempting to develop the wetland area over an unspecified time before Waterford Township officials sent them a cease-and-desist letter.
[38] We are not bound by the decisions of the courts of other states; however, we may look to these regulatory taking decisions as persuasive authority. See Farm Bureau Mut. Ins. Co. v. Buckallew, 246 Mich.App. 607, 614 n. 6, 633 N.W.2d 473 (2001).
[39] See K & K I, supra at 61, 551 N.W.2d 413 ("[T]he state has a legitimate interest in preserving and protecting wetlands."), citing Attorney General ex rel Dep't of Natural Resources v. Huron Co. Rd. Comm., 212 Mich. App. 510, 516, 538 N.W.2d 68 (1995) ("`[t]he primary purpose of the WPA is to ensure that wetland habitats are preserved and protected'"); Brace v. United States, 48 Fed Cl 272, 278, 279 (2000) (noting that Congress passed the CWA in part to protect wetlands. The court noted that "[t]here is no question that the systemic destruction of the Nation's wetlands is causing serious, permanent ecological damage.").
[40] It is worth noting that the Alaska Supreme Court held that the Alaska state constitution provides greater protections for property owners than the United States Constitution does under the Fifth Amendment. R & Y, Inc., supra at 293. Our Supreme Court has adopted the United States Supreme Court's Penn Central test, signaling that our Supreme Court has decided that the Michigan Constitution provides no greater protection for property owners than that provided by the Fifth Amendment. Though Alaska's constitution provides greater property protections than do the United States Constitution and the Michigan Constitution, the Alaska Supreme Court nevertheless held that enforcement of the challenged wetlands regulations did not effect a compensable taking of the plaintiff's property. Id. at 300.
[41] Though the alleged economic effect in R & Y is less than the alleged economic effect here, the reasoning and analysis of R & Y are equally applicable here.
[42] Indeed, we note that the historical district preservation regulations upheld in Penn Central were far less universal and ubiquitous, and much closer to singling out individual property owners, than the wetland regulations challenged here. The Supreme Court in Penn Central nevertheless held that the regulation benefited the public as a whole, which weighed heavily against finding that a taking had occurred. See Penn Central, supra at 134-135, 98 S.Ct. 2646.